UTAH POWER & LIGHT COMPANY AND SUBSIDIARY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Utah Power & Light Co. & Subsidiary v. Commissioner
Docket No. 6552-89
United States Tax Court
T.C. Memo 1991-535; 1991 Tax Ct. Memo LEXIS 584; 62 T.C.M. (CCH) 1089; T.C.M. (RIA) 91535; October 28, 1991, Filed *584 Decision will be entered under Rule 155. Karl William Kolbe, Jr., Elizabeth A. Smith, and Keith E. Marlowe, for the petitioner. Thomas N. Thompson, for the respondent. SWIFT, Judge. SWIFT
Respondent determined deficiencies in petitioner's consolidated Federal income tax as follows: Year
Deficiency
1982
$ 196,095
1983
$ 5,084,075
1984
$ 3,916,678
1985
$ 608,021
After settlement of some issues, the issue for decision is whether Utah Power & Light Co. (petitioner) is entitled under the all-events test of section 461[1] to accrue certain coal production royalties at a rate of 15 cents per ton of coal produced, as respondent contends, or at a rate of 5 percent of the value of the coal produced, as petitioner contends. OPINION This case was submitted under Rule 122. The facts *585 stipulated by the parties are so found. Petitioner is a regulated public utility company engaged in the production, transmission, and distribution of electrical power in the States of Idaho, Utah, and Wyoming. Approximately 95 percent of the power necessary for the production of electrical power petitioner sells to customers is generated by the burning of coal obtained by petitioner from underground coal mines. The coal mines are located on Federal property and are operated by petitioner under 20-year mining leases granted by the Federal Government to petitioner or to various third parties (in which case the leases are sublet to petitioner). Before February 23, 1982, under the Federal coal mining leases granted or sublet to petitioner, petitioner owed and paid coal production royalties to the U.S. Department of the Interior at the rate of 15 cents per ton of coal produced from mines covered by the leases. Effective March 1, 1982, pursuant to written notification dated February 23, 1982, and based on statutory authority set forth in 30 U.S.C. section 207 (1988) and regulations thereunder at 43 C.F.R. section 3473.3-2 (1984), upon renewal of the leases, the Department of the Interior *586 increased the royalty rate to 8 percent of the value (i.e., of the representative field price) of coal produced from properties whose 20-year lease terms expired on March 1, 1982. The February 23, 1982, notification to petitioner from the Department of the Interior concerning the royalty rate increase indicated that the increased royalty rate was to be consistent with "the minimum prescribed" in 43 C.F.R. section 3473.3-2 (i.e., at least 5 percent of the value of the coal produced) and that petitioner could appeal or contest the rate increase. The notification also specified that during the pendency of any appeal the existing lease terms and conditions would remain in effect, that royalties need not be paid by petitioner at the increased rate until the appeal was concluded, but that, "The increased rental and royalties, although not collected will accrue from the effective date of the readjustment, as shown on the proposed readjusted lease forms, until the issues on appeal are finally determined." On April 26, 1982, after the Department of the Interior announced the increased royalty rate, petitioner filed with the Bureau of Land Management (BLM), a formal objection to the proposed *587 rate increase with respect to two of the properties covered by its subleases. The basis for petitioner's objection to the 8-percent royalty rate was that particularly difficult mining conditions existed on these two properties resulting in higher mining costs and therefore justifying, under the provisions of the Department of the Interior's statutory and regulatory authority, the payment by petitioner of a lesser royalty rate for coal produced from these properties. During 1982, 1983, 1984, and 1985, petitioner's rate contest was considered at various levels of the BLM and the Department of the Interior. On March 22, 1983, the Utah Director of the Minerals Management Service of the BLM, for stated procedural or jurisdictional reasons, denied petitioner's request for a reduction in the royalty rate for the two properties in question. In the written notification of the denial, the BLM made express reference to the regulations under 43 C.F.R. 3473.3-2(a)(3) (1984) and stated -- Present regulations fix the underground royalty rate at 8 percent but allow the authorized officer to lower the rate to 5 percent if conditions warrant. [2]
*588 Explaining further that the Utah Director of the Minerals Management Service of the BLM was not an "authorized officer" under the above-referenced regulations, the March 22, 1983, notification emphasized that the 8-percent royalty rate was the minimum royalty required upon lease renewal and that petitioner could appeal the rate increase to the appropriate BLM and Department of the Interior officials, but that any such appeal did -- not eliminate the requirement to issue a new or readjusted lease at the [8-percent] specified rate. In a Department of the Interior Solicitor's opinion dated December 11, 1974, it is stated, "In no case, however, may such (royalty) reductions be prescribed as part of the initial or readjusted terms of any lease. The relief afforded by section 39 is meant to occur apart from the establishment of the basic lease terms for any given lease period." Thus any application for royalty reduction must be after acceptance of the readjusted lease terms and conditions. * * *
In the event an appeal is filed [from rejection of the rate reduction], the existing lease terms and conditions will remain in effect pending the outcome of the appeal. The increased *589 royalties, although not collected [by the BLM from petitioner], will accrue from the effective date of the readjustment, as shown on the proposed readjusted lease form, until the issues on appeal are finally determined.
On April 21, 1983, petitioner filed with the Department of the Interior's Board of Land Appeals (Board of Land Appeals), a notice of appeal of the denial of its request for a reduction in the coal production royalty rate on the properties in question. In a memorandum supporting its appeal, petitioner referenced 43 C.F.R. section 3473.3-2(a)(3) and argued that a royalty rate should be set for the affected properties of -- "not more than five percent of the value of the coal mined therefrom." On June 16, 1983, the BLM filed an objection to petitioner's appeal. In the BLM's written objection, the request was made that petitioner's appeal be remanded "to the BLM for a determination under 43 C.F.R. section 3473.3-2(a)(3) if conditions warrant a royalty rate of less than 8 percent." The BLM's written objection expressly stated further, as follows: in the readjustment of a coal lease for an underground mine a royalty rate of less than 8 percent, but no less than *590 5 percent, could be established if the BLM finds that "conditions warrant" it.
and it expressly acknowledged that petitioner -- asks that the Board set a royalty rate of 5 percent on its leases, asserting that documentation in the records of the [BLM] warrant a recommendation for reduction to that rate. * * * In the conclusion to its written objection to petitioner's appeal, the BLM reiterated that petitioner's appeal ought to be remanded to the BLM -- for a determination under the regulation at 43 C.F.R. 3473.3-2(a)(3) (1982) whether the evidence presented by [petitioner] establishes that conditions warrant a royalty rate of less than 8 percent and, if so, what rate between 8 and 5 percent is appropriate.
On April 16, 1984, the Board of Land Appeals issued a written decision in which it remanded petitioner's appeal to the BLM and directed the BLM to determine the royalty rate that was appropriate with respect to the two properties covered by petitioner's rate contest. In its April 16, 1984, decision, the Board of Land Appeals acknowledged that petitioner asked only that -- the royalty rate in the leases [in question] be reduced to not more than 5 percent *591 of the value of the coal mined therefrom.
and the Board of Land Appeals explained further that -- Subsections (a)(1) and (a)(3) of 43 CFR 3473.3-2 implement 30 U.S.C. sec. 207(a) (1976) and provide that a rate as low as 5 percent may be determined at lease issuance if conditions warrant such reduced royalty rate. * * * In this case * * * BLM has determined that appellant should be allowed an opportunity to establish prior to lease issuance that "conditions warrant" a royalty rate of less than 8 percent under 43 CFR 3473.3-2(a) * * *. We agree. * * * [Emphasis added.]
In its decision, the Board of Land Appeals also acknowledged that under certain circumstances alternative rate relief may be available under 43 C.F.R. section 3473.3-2(d). The Board of Land Appeals, however, expressly concluded that petitioner with respect to its pending appeal was seeking, a reduction under 43 C.F.R. section 3473.3-2(a), and the issue remanded to the BLM was the appropriateness of a reduction under the latter regulation. On remand to the BLM, petitioner argued, consistently with the remand decision of the Board of Land Appeals, that the BLM reduce the coal production royalty *592 rate on the properties in question to "not more than five percent of the value of the coal mined from the above leases." On June 21, 1985, the BLM issued a decision upholding the increase in the royalty to the full 8-percent rate. On July 11, 1985, petitioner filed a notice of appeal to the Board of Land Appeals of the BLM's June 21, 1985, decision. In a memorandum dated August 5, 1985, supporting its appeal, petitioner raised certain procedural objections to any proposed increased royalty rate, and petitioner claimed that the royalty rate should be "reduced to an amount of not more than 5 percent of the value of the coal mined" from the properties. On March 14, 1988, the Board of Land Appeals issued a final order affirming the decision of the BLM increasing the coal production royalty on the properties in question to the full 8-percent rate. In none of the documents associated with petitioner's royalty rate contest and with the BLM's objection thereto is any express reference made by petitioner or by the BLM to the provisions of the Department of the Interior's regulations under 43 C.F.R. section 3473.3-2(d), under which, upon a proper showing, a royalty may be established at *593 any rate. [3]
Only the Board of Land Appeals, in its remand order of April 16, 1984, and only by way of general explanation and comparison of the authority of the Department of the Interior with that of the BLM was reference made to 43 C.F.R. section 3473.3-2(d). In 1982, 1983, and 1984, during the pendency of petitioner's royalty rate contest with the BLM and the Department of the Interior, petitioner paid to the U.S. Government coal production royalties *594 with respect to the coal produced on the two properties involved in its rate contest on the basis of 15 cents per ton of coal produced (i.e., on the basis of the pre-February 1982 royalty rate). During these same years, however, the Utah Division of Public Utilities required that the full cost of coal royalties incurred by petitioner be passed through to petitioners' customers and that petitioner, during 1982, 1983, and 1984 (while its rate contest was pending), include the increased coal production royalties at the increased 8-percent rate, as a cost in calculating its rates and charges to be billed to customers. It is the position of the Utah Division of Public Utilities that if petitioner's rate contest with the BLM and with the Department of the Interior had been successful, petitioner would have been required to repay any excess charges collected from its customers on the basis of the 8-percent royalty rate. After petitioner's rate contest was completed in October of 1988, petitioner in October of 1988 and in January of 1989 paid to the Department of the Interior the full amount of the additional coal royalties it had accrued on coal produced from the two properties since *595 February 28, 1982, on the basis of the 8-percent royalty rate. Also, in October of 1988, petitioner entered into an agreement with the Department of the Interior and with the State of Utah under which it was agreed that petitioner would pay interest on the additional coal royalties due the Department of the Interior relating to the amount of coal produced on the properties in question only on the basis of a 5-percent royalty rate, not on the basis of the full 8-percent royalty rate finally determined. In late 1988 or early 1989, petitioner apparently paid this interest. For financial and regulatory accounting purposes, and also for Federal income tax purposes, petitioner maintains its books and records on the accrual method of accounting. During 1982, 1983, and 1984, for both financial and regulatory accounting purposes, petitioner accrued as an expense royalties due on coal produced on the properties in question on the basis of an 8-percent royalty rate. Petitioner's financial books and records for each year were certified by an independent public accounting firm as having been prepared consistently with generally accepted accounting principles. On its consolidated Federal income *596 tax returns for 1982, 1983, and 1984, petitioner accrued deductions for coal production royalties with respect to coal produced on the properties in question on the basis of the full 8-percent royalty rate announced by the Department of the Interior in February of 1982. On audit, respondent disallowed the total amount of these accrued deductions. Petitioner now claims its entitlement to accrue deductions for the coal production royalties for 1982, 1983, and 1984 on the properties in question only on the basis of a 5-percent royalty rate (i.e., on the basis of the minimum reduced royalty rate for which petitioner was seeking approval). At trial, respondent indicated he would allow petitioner to accrue deductions for such coal production royalties only on the basis of 15 cents per ton of coal produced (namely, on the basis of the rate at which petitioner was actually making royalty payments during the pendency of the rate contest). For 1985, there is no issue concerning the tax accrual of coal production royalties. DISCUSSION Accrual basis taxpayers are entitled to deduct expenses in the year in which their liability for the expenses is incurred, regardless of when the expenses *597 are actually paid. For Federal income tax purposes, expenses are incurred for accrual basis taxpayers when "all the events have occurred which determine the fact of the liability [for the expenses] and [when] the amount thereof can be determined with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs. Taxpayers' liability for the expenses -- the first prong of the all-events test -- must be "firmly established." United States v. General Dynamics Corp., 481 U.S. 239, 243, 95 L. Ed. 2d 226, 107 S. Ct. 1732 (1987). As the regulations indicate, the amount of the expenses to which the liability attaches -- the second prong of the all-events test -- must be established with reasonable accuracy. [4]
*598 The requirement that taxpayers' liability for accrued expenses must be firmly fixed is to be strictly construed, and taxpayers generally have the burden of proving that the accrued expenses are in fact uncontested. As explained in General Communication Co. v. Commissioner, 33 T.C. 640, 654 (1960), with respect to contested liabilities -- The taxpayer has the burden of proving that the asserted liability was in fact uncontested. The presence of an admission, express or implied, serves as direct proof that the taxpayer was not contesting liability. But absence of an admission, while not conclusive proof of a contest, certainly leaves a gap in petitioner's proof in the circumstances of this case. A taxpayer may resist payment of an asserted claim in more subtle ways than express denial of liability or adoption of a litigious attitude. The facts of the instant case are an excellent example of this, for without evidencing express denial, they strongly indicate that petitioner intended to resist payment, in an effort either to compromise its liability or, if necessary, defend against it. * * * [Fn. ref. omitted.]
When accrual basis taxpayers contest their *599 liability for expenses, the existence of the contest generally renders their liability for the expenses contingent, and accrued deductions for the expenses will not be permitted until the contest is over and final. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 519, 88 L. Ed. 270, 64 S. Ct. 364 (1944). That portion of accrued expenses, however, which is not contested is deductible. Treasury Regulations explain this principle, which is particularly important to our analysis in this case, as follows: While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. For example, A renders services to B during the taxable year for which A claims $ 10,000. B admits the liability to A for $ 5,000 but contests the remainder. B may accrue only $ 5,000 as an expense for the taxable year in which the services were rendered. * * * [Sec. 1.461-1(a)(2), Income Tax Regs.]
Where only extremely remote and speculative possibilities *600 exist that the taxpayers' liability for the expenses may be reduced or eliminated, the taxpayers will be entitled to accrue tax deductions with respect to the expenses. United States v. Hughes Properties, Inc., 476 U.S. 593, 601-602, 90 L. Ed. 2d 569, 106 S. Ct. 2092 (1986). Respondent has broad powers in determining whether accounting methods used by taxpayers clearly reflect income, and the fact that taxpayers are entitled or required to accrue expenses for financial accounting or regulatory purposes does not necessarily entitle taxpayers to accrue the expenses for Federal income tax purposes. United States v. Hughes Properties, Inc., 476 U.S. at 603. Whether the accrual of expenses satisfies, for Federal income tax purposes, the all-events test is analyzed in light of the facts and circumstances which the taxpayers knew or could reasonably be expected to know at the close of the books and records for each of the taxable periods in question. Globe Products Corp. v. Commissioner, 72 T.C. 609, 621 (1979); Baltimore Transfer Co. v. Commissioner, 8 T.C. 1, 7 (1947). Certain aspects of the process of contesting adjustments to mineral *601 production royalty rates under Federal mining leases have been described as follows: readjustment is a process -- not a single act. The process is initiated by notice of intent to readjust. The readjusted terms do not become final until several months, or even years, later. Because readjustment is a process, it would be illogical to conclude that readjustment must take place, if at all, "at" a particular time, unless the word "at" is broad enough to include the entire period of time required for readjustment. [Coastal States Energy Co. v. Watt, 629 F. Supp. 9, 15 (D. Utah 1985), affd. in part and revd. in part sub. nom Coastal States Energy Co. v. Hodel, 816 F.2d 502 (10th Cir. 1987). Fn. ref. omitted.]
Respondent herein does not seriously dispute that petitioner's accrual during 1982, 1983, and 1984 of the coal production royalties in issue satisfies the first prong of the all-events test. The fact of petitioner's liability to pay the Federal coal production royalties with respect to the coal produced from the two properties in question was established as coal was mined from the ground. The dispute herein primarily concerns *602 the amount of that liability. Petitioner argues that, during the years in issue, it contested its liability for the coal production royalties only with respect to that portion of the increased royalty rate that exceeded 5 percent of the value of the coal produced. Petitioner argues, therefore, that only the portion of the increased royalty rate above the 5-percent rate was not properly accruable under the all-events test of section 461. Respondent argues that, for Federal income tax purposes and for the years before us, petitioner should not be entitled to accrue coal production royalties on the two properties in question above the 15-cents per ton rate at which petitioner actually paid the royalties during the pendency of the royalty rate contest. Respondent argues that it was "by no means a certainty" that petitioner would end up paying any royalties at the increased rate. Respondent bases his argument on two main points: (1) Petitioner never "flatly conceded that any increased royalty was appropriate during its administrative appeals;" and (2) the Department of the Interior, under 43 C.F.R. sec. 3473.3-2(d), theoretically, could have reduced the royalty rate applicable to the *603 properties involved in petitioner's rate contest to any amount (except to zero). If respondent's argument were correct, petitioner, technically, would not be entitled to any accrual during the years in issue. As explained, however, for purposes of this case, respondent would allow petitioner to accrue the royalties in issue at the 15-cents per ton rate at which petitioner actually made payments of royalties during the pendency of the rate contest. Respondent argues further that petitioner should have utilized the provisions of section 461(f) if petitioner desired to accrue deductions for any royalties above the 15-cents per ton rate. Generally, under that section, where taxpayers contest their liability for deferred expenses, they may nevertheless be entitled to current tax accruals with regard to the contested expenses if the taxpayers transfer beyond their control money or other property to provide for the satisfaction of the expenses. Respondent contends that, absent such a transfer, during the years in issue, petitioner's liability for the royalties at any rate above 15-cents per ton was contingent on the final outcome of petitioner's rate contest with the BLM and the Department *604 of the Interior, and therefore that petitioner's liability for any royalties above 15-cents per ton could not be ascertained with reasonable accuracy during the years in issue. As explained, the fact that a dispute or contest over the amount of a liability makes the exact amount of the liability uncertain (or to use respondent's words, "no means a certainty") does not prevent the accrual of the amount of portion thereof that can be determined "with reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs.
On the facts of this case, it is clear that petitioner only contested that portion of the increased coal production royalty rate that exceeded 5 percent of the value of the coal produced and that the likelihood that petitioner's rate contest with the BLM and the Department of the Interior would result in a royalty rate of less than 5 percent was extremely remote and speculative. What rate between 5 and 8 percent petitioner would have to pay upon conclusion of the rate contest was not determinable during the years in issue. But the fact that petitioner would have to pay a rate of at least 5 percent of the value of the coal produced was ascertainable with reasonable accuracy during *605 1982, 1983, and 1984. Accordingly, during those years, petitioner is entitled to accrue the coal production royalties at that rate. Throughout 1982, 1983, and 1984, the documents petitioner filed with the BLM and with the Department of the Interior are clear that petitioner was asking for a rate reduction from 8 percent of the value of the coal produced down to 5 percent of the value of the coal produced (the maximum amount of any rate reduction allowed by 43 C.F.R. section 3473.3-23(a)). Documents issued by the BLM and the Department of the Interior during 1982, 1983, and 1984, in connection with petitioner's rate contest, are clear and consistent and reflect that the only reduction being considered by the BLM and the Board of Land Appeals was a reduction under 43 C.F.R. section 3473.3-2(a) from the 8-percent rate to the 5-percent rate. In its remand order of April 16, 1984, the Board of Land Appeals made reference to 43 C.F.R. section 3473.3-2(d), but only by way of explaining the general law and regulations applicable to rate contests. That document clearly directs the BLM to reconsider its rejection of petitioner's rate contest under 43 C.F.R. section 3473.3-2(a), under which *606 the lowest royalty rate that could be determined was 5 percent of the value of the coal produced. Respondent interprets the reference (in the Board of Land Appeals' April 16, 1984, remand order) to "additional evidence" that might be submitted by petitioner on remand to the BLM as an indication by the Board of Land Appeals that the remand hearing was to be expanded under 43 C.F.R. section 4373.3-2(d) and that petitioner would be entitled to ask for a rate reduction below the 5-percent rate. We disagree. We interpret the reference to "additional evidence" merely as a suggestion that, on remand to the BLM, petitioner should be allowed to submit any additional relevant information bearing upon the rate reduction requested by petitioner under 43 C.F.R. section 3473.3-2(a). Not until August 7, 1985, did petitioner in any way allege or suggest that any rate increase might be inappropriate. That general allegation, however, made in 1985, casts no reasonable doubt on petitioner's liability for the coal production royalties at a rate of at least 5 percent as of the end of 1982, 1983, and 1984. At the end of each of those years, the scope and nature of petitioner's rate contest was clear. *607 It was based on the provisions of 43 C.F.R. section 3473.3-2(a). Thereunder, the lowest rate that could be set by the BLM was 5 percent of the value of the coal produced. Further, we do not interpret the general reference petitioner made in August of 1985 to various procedural arguments (that might prevent any increase in the royalty rate) as a serious attempt to disavow what petitioner had been alleging consistently throughout 1982, 1983, and 1984 in connection with its rate contest (namely, that the royalty rate should be reduced under 43 C.F.R. section 3473.3-2(a) to 5 percent of the value of the coal produced). We believe that respondent fundamentally misreads the relevant documents in this case. Therein, petitioner alleges consistently that the royalty rate should be set at "no more than 5 percent." We regard this as a concession by petitioner that as far as petitioner was concerned 5 percent of the value of the coal produced was an appropriate, acceptable rate, that if the rate was set at 5 percent, such rate would not be further contested, and that this concession, as a practical matter, eliminated any reasonable possibility that the BLM would lower the rate to anything *608 below the 5-percent rate. The documents of the BLM and of the Board of Land Appeals indicate that those two agencies so understood petitioner's position. Under the facts of this case, we believe that during the years in issue, the possibility that the coal production royalty rate in question would be established at a rate below 5 percent of the value of the coal produced was remote and speculative. At the end of each of the years in issue, it was established with reasonably accuracy (see sec. 1.461-1(a)(2), Income Tax Regs.) that the amount of petitioner's liability for coal production royalties with respect to the properties in question would be based on a rate of at least 5 percent of the value of the coal produced. Whether petitioner would have to pay the royalties at a rate above 5 percent of the value of the coal produced was not established with reasonable accuracy, and (as petitioner now concedes) during the years in issue no accrual is allowable at a rate in excess of 5 percent of the value of the coal produced. Respondent erroneously argues that petitioner (in order to accrue the royalties in issue during the pendency of the rate contest) should have followed the procedures *609 provided in section 461(f) and paid the royalties into a trust fund. Although such procedure may have been available to petitioner, it does not, in this case, assist in resolving the issue of whether an accrual of the royalties at the 5-percent rate was proper under the all-events test. For the reasons stated, we conclude that during each of the years in issue petitioner is entitled to accrue the coal production royalties at the rate of 5 percent of the value of the coal produced. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. 43 C.F.R. Sec. 3473.3-2(a)(3) provides in pertinent part as follows: (3) A lease shall require payment of a royalty of not less than 8 percent of the value of the coal removed from an underground mine, except that the Minerals Management Service may determine a lesser amount, but in no case less than five percent if conditions warrant↩. [Emphasis added.]
3. 43 C.F.R. section 3473.3-2(d) provides in pertinent part as follows: (d) The Secretary, whenever he/she determines it necessary to promote development or finds that the lease cannot be successfully operated under its terms, may waive, suspend or reduce the rental, or reduce the royalty but not advance royalty, on an entire leasehold, or on any deposit, tract or portion thereof, except that in no case shall the royalty be reduced to zero percent. An application for any of these benefits shall be filed with the Mining Supervisor in accordance with 43 CFR Part 3480↩.
4. With regard to certain types of liabilities, certain aspects of the "all events" test have been incorporated into section 461(h) by the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 598, 607, effective as of July 18, 1984, the date of enactment of the Deficit Reduction Act. See sec. 91(g)(1)(A) of that Act. Neither party herein argues that section 461(h)↩ applies to the particular expenses in issue in this case.