SPRINGS LAND COMPANY, LIMITED PARTNERSHIP, STEVE K. SMITH, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Springs Land Co. v. Commissioner
Docket No. 42214-86.
United States Tax Court
T.C. Memo 1992-197; 1992 Tax Ct. Memo LEXIS 220; 63 T.C.M. (CCH) 2641; April 1, 1992, Filed *220 Decision will be entered for the respondent F. Pen Cosby, for petitioner. Sergio Garcia-Pages, for respondent. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined adjustments to partnership items for the 1982 and 1983 taxable years as follows: [1]
Dec. 31, 1982
Dec. 31, 1983
(A)
Commissions disallowed
$ 1,828,624
($ 16,270) [1]
(B)
Travel expenses disallowed
11,747
Total
$ 1,840,371
($ 16,270)
*221 The issues for decision are: (1) Whether Springs Land Co., Ltd., a limited partnership, may accrue and deduct sales and finance commissions in 1982 and 1983 based on purported sales of condominium time shares; and (2) whether Springs Land Co., Ltd., may deduct travel expenses of $ 11,747 related to the purported sales of condominium time shares in 1982 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulations of fact, and attached exhibits are incorporated herein by this reference. Pursuant to section 7482(b)(2), [2] the parties have stipulated that venue for purposes of an appeal from this decision will be the Eleventh Circuit. Springs Land Company, Ltd. (SLC), reported income on an accrual basis. Prior to January 1, 1982, petitioner, Steve K. *222 Smith, operated his own business under the name of Industrial Petroleum Supply, Inc. He had also purchased several single-family homes and an office building for rental purposes. Petitioner had also been involved in some commercial property ventures with local businessmen in Owensboro, Kentucky. In 1980, petitioner invested as a limited partner in an Indiana partnership which was involved in the purchase and resale of time-share interests in resort properties. In 1982, petitioner decided to form SLC. The stated purpose of SLC was the "purchase at wholesale and sale at retail of condominium apartments through interval ownership in Florida and other states." In February 1982, petitioner authorized Thomas E. Neal, an attorney in Owensboro, Kentucky, to file the partnership name with the secretary of state in the Commonwealth of Kentucky. Petitioner also formed, and is the sole shareholder in, Ilex Property Services, Inc. (Ilex). In June 1982, the SLC prospectus was completed and given to petitioner's friends and business associates in Owensboro. A one-page memorandum from "Steve K. Smith, General Partner" was sent out with the prospectus encouraging investors to seek competent *223 advice before investing. The memorandum stated that the primary reason for the endeavor was to produce a profit, but also stated that the financial projections reflected a 3.67 to 1 loss ratio in the first year. The prospectus makes it clear that the "loss ratio" referred to in petitioner's memorandum is the ratio of each partner's loss for tax purposes to their respective cash investment. Attached to the prospectus is a lengthy opinion with respect to the Federal income tax aspects of investments in SLC which was prepared and signed by attorney Thomas E. Neal. That same month, the first limited partners executed their subscription materials. Twenty investors became limited partners in SLC during 1982, making a total cash investment of $ 405,000. Petitioner is the only general partner in SLC. Petitioner, as general partner of SLC, entered into a "Marketing Agreement" with Ilex on November 13, 1982. Petitioner also signed the agreement as president of Ilex. This agreement granted Ilex the nonexclusive right to market condominium time-share units acquired by SLC. In return for marketing the units, Ilex would receive a sales commission equal to 70 percent of the sales price. *224 Ilex would also receive 50 percent of all interest payments generated by installment sales of property. The following specific payment terms appear in the "Marketing Agreement": 5. Marketing Corporation [Ilex] will perform and pay for all marketing, promotional and advertising services. Marketing Corporation will obtain and pay for the services of the best real estate brokerage firm available to it whose expenses shall be paid from the expenses of the proceeds provided for in this contract. Marketing Corporation will provide the best reasonably available technical, administrative and computer services. Marketing Corporation will also arrange for the development of models and architectural and interior decorating services necessary to the renovation and development activities required for the best interest of the projects in accordance with budgets and schedules to be agreed upon with Springs Land Company. Marketing Corporation will also furnish at its expense all necessary condominium documents and will obtain all necessary building permits and licenses. 6. In exchange for Marketing Corporation's efforts in development and marketing, Springs Land Company agrees to *225 pay sales commissions in the amount of (70%) percent on each and every sale. The commission will be due and payable when there is an accepted offer to purchase, whether said sale is achieved by installment sales contract, cash or deposit. Marketing Corporation will accrue the entire commission at the time of sale so the Springs Land Company will be able to deduct the commissions in full for tax purposes. Marketing Corporation will be entitled to receive all of its commission at the time of sale. The remaining balance shall be paid to Marketing Corporation by Springs Land Company as funds are collected and available. The payment of the balance of all sums due Marketing Corporation shall be payable on or before January 1, 1990; however, the payment of sales commissions shall be harmonized with the cash requirements of the Partnership. Additionally, Marketing Corporation shall be paid fifty (50%) percent of interest payments derived from installment payments generated by these sales. 7. In the event of default or other contractual failure by unit week purchasers which causes reversion of the unit weeks to Springs Land Company's ownership; then Marketing Corporation agrees *226 to exert its best efforts to resell those unit weeks at no additional commission above the seventy (70%) percent previously earned. In the event that Marketing Corporation fails to resell, it may waive unpaid commissions pro rata to unearned portion or, if Marketing Corporation shall have been fully paid, Marketing Corporation may repay the unearned portion of its commission. In order to facilitate and assure compliance with this paragraph, there shall be a ( ) percent retention or reserve for bad debts.
Respondent's adjustments to SLC's partnership items for 1982 arise from three transactions. Each of these three transactions involves the purported purchase and sale by SLC of time-share unit weeks in resort condominium developments. The Atlantic Resorts Transaction
In November 1982, petitioner was contacted by Martin L. Schuman, Jr., president of Atlantic Resorts, Ltd., Inc. (Atlantic). Atlantic was involved in the development and marketing of resort condominium real estate in the area of Ocean City, Maryland. Petitioner and his attorney, Mr. Neal, traveled to Maryland where they met with Martin L. Schuman, Jr., and an attorney for Atlantic, Guy R. Ayres, III. The *227 culmination of this meeting was the execution of several documents. One of these documents was styled "Memorandum of Understanding" and was executed on behalf of SLC, Ilex, and Atlantic. The memorandum of understanding provided for a sale by Atlantic of real estate (in the form of condominium time-share weeks) to SLC. SLC agreed to purchase the time-share weeks for 17 percent of their specified retail value or $ 153,900. The memorandum also provided for the marketing of the units purportedly purchased. Paragraph three of the memorandum provided: 3. [SLC] contracts with [Ilex] to market said inventory for seventy (70%) percent of said inventory's retail price, only on sales that will qualify as installment sales under the Internal Revenue Code, amendments thereto and regulations thereunder, and [Ilex] hereby contracts with [Atlantic] to market said inventory for sixty-five (65%) percent of said inventory's retail price, only on sales that will qualify as installment sale under said Internal Revenue Code. [SLC], [Atlantic], and [Ilex] each agree that they will use the accrual method of accounting. [Ilex] and [Atlantic] agree to sell all of said inventory owned by [SLC] at *228 retail on an installment sales basis prior to December 31 of the current year.
The memorandum outlined other respective rights and obligations as follows: 4. Owner [3] shall have the right to obtain, without further consent by [SLC], a loan or (sic) not to exceed 50% of the real estate being sold herein, determined by dollar volume, secured by a mortgage on the real estate, and also shall have the right to renew or increase any such mortgage loan. However, the balance due in respect of any such mortgage loan at no time shall exceed the unpaid balance of the purchase price due hereunder. If Owner encumbers the real estate by a mortgage and defaults thereunder, [SLC] shall have the right to cure such default and to deduct the cost thereof from the next payment or payments due under this Contract. Owner shall pay any such mortgage loan when due or at such earlier time as [SLC] pays in full the unpaid balance of the purchase price hereunder. 5. Owner shall keep the improvements on said real estate insured under fire and extended coverage policies and pay the premiums on such insurance policies as they become due. Such insurance shall be obtained from companies approved *229 by [SLC] in an amount not less than the balance of the purchase price due hereunder, or to the full extent of their insurable value, if that is less. Such policy or policies shall be issued in the name of Owner only, but Owner hereby assigns to [SLC] so much of the proceeds from said policies as will fully reimburse [SLC] for any casualty losses, and Owner shall furnish [SLC] with a certificate evidencing such coverage. * * * * 11. In the event a third party buyer defaults on his agreement to purchase from [SLC] or defaults on his note after purchase, then in that event [SLC] shall have the option to re-convey said unit week or weeks to [Atlantic] and require [Atlantic] to convey to it a unit week or weeks of equal value in lieu thereof. * * * * 15. Owner shall fully comply with all Federal, State and local laws and regulations affecting the sale and marketing of time interval unit weeks, including but not limited to disclosure and escrow requirements; and Owner assumes all liability of any type growing out of Owner's operations and Owner shall indemnify and hold [SLC] harmless from any and all claims or losses arising from said operations, including payment of all costs and *230 attorney's fees.
The memorandum was signed by all parties but never dated. A letter from Mr. Ayres to Mr. Neal, dated November 16, 1982, purports to accompany copies of the memorandum in addition to the following listed documents: a "Safeco Title Insurance Binder in the amount of $ 153,900", an "Original Note", a "Copy of Mortgage", a "Certified copy of Corporate Resolution", and a "Copy of proposed deed". Atlantic was unable to transfer unencumbered title to the time-share unit weeks and, consequently, offered additional collateral of two additional condominium units and mortgages on four waterfront lots. Atlantic executed a document that conveyed a mortgage to SLC (the mortgagee) on four lots located in Ocean City, Maryland as security for Mortgagee's "loan" to mortgagor of $ 153,900. The title insurance binder acquired by SLC on November 15, 1982, related to the mortgage and underlying property conveyed in the indemnity mortgage securing the loan of $ 153,900 rather *231 than the time-share units purportedly purchased by SLC. On December 14, 1982, Atlantic executed a deed to the condominium time-share weeks in favor of SLC. SLC paid Atlantic the agreed upon consideration of $ 153,900. On December 27, 1982, petitioner executed contracts to sell these condominium time shares to Town & Shore Realty, Inc. (Town & Shore), at the retail price of $ 900,000. Martin L. Schuman, Jr., the president of Atlantic, signed the contracts as president of Town & Shore, which was owned by Martin Schuman, Sr.
Town & Shore made no downpayment, and SLC took back a nonrecourse mortgage note from Town & Shore for the full amount of the purchase price. Upon execution of the sale contract with Town & Shore, SLC accrued sales commissions payable to Ilex of $ 630,000 and finance commissions payable to Ilex of $ 236,235. Accordingly, Ilex recorded $ 630,000 and $ 236,235 of commissions receivable for the 1982 tax year. Pursuant to the terms of the memorandum of understanding, Atlantic was to forward to SLC notes and mortgages received from third-party purchasers for collection of deferred payments on the installment sale. Atlantic failed to meet this requirement and on *232 July 21, 1983, executed an addendum to the original memorandum providing that Atlantic would assign to SLC notes and deeds of trust equal to 25 percent of the dollar volume of notes and deeds of trust received from sales of unit weeks to third-party purchasers or $ 4,000 per week, whichever is greater, until all Atlantic's and Town & Shore's obligations were satisfied in full. It is unclear what payments, if any, were made by Town & Shore to SLC for the purported purchase. It is clear that no payments were made after the middle of 1987, and as of the time of trial (March 21, 1990), SLC had not instituted any action to recover the property. The Calini Beach Resorts Transaction
In November 1982, petitioner met with Robert L. Darfus, the principal stockholder in Calini Beach Club Development, Inc. (Calini), and the corporation's accountant, Gabriel J. Schlosser. Petitioner and Mr. Neal traveled to Sarasota, Florida, where they executed a memorandum of understanding which provided for the purchase of 51 weeks in a resort condominium, unit 403. The terms of this memorandum were nearly identical to those of the Atlantic memorandum. SLC was to pay Calini 17 percent of the designated *233 retail price of the unit weeks. It was agreed that the designated retail price was $ 752,000 and that SLC's purchase price was $ 127,840. The memorandum contained the same terms quoted from the Atlantic transaction which provided that Ilex would market the units for a commission of 70 percent and that Calini would market the property for Ilex for a sales commission of 65 percent. Once again, commissions were payable only on sales which were installment sales for purposes of the Internal Revenue Code; all parties agreed to use the accrual method of accounting; and Calini and Ilex agreed that all the units concerned were to be sold prior to the end of the current year. The memorandum also contained essentially the same provisions regarding the rights and obligations of the parties with respect to the property as in the Atlantic memorandum. [4]
On December 10, 1982, Mr. Darfus and his wife executed *234 a warranty deed purporting to convey the time shares to SLC. [5] On December 28, 1982, Calini, as "seller", executed an agreement purporting to sell 41 of SLC's 51 unit weeks in unit 403 to Preferred Investments, Inc. (Preferred), a Florida corporation, for $ 737,250. The purported sales documentation was executed on behalf of Preferred by its treasurer, Mr. Schlosser, who was also Calini's accountant. Preferred made no downpayment and SLC took back a nonrecourse mortgage note and deed for the entire amount of the purchase price. The note and mortgage were also executed on Preferred's behalf by Mr. Schlosser. SLC accrued commissions payable to Ilex and Ilex accrued the commissions receivable. The sales commissions accrued on this sale were $ 516,075 and the finance commissions accrued were $ 428,428. On February 23, 1983, Mr. Schlosser sent a letter to SLC purportedly accompanying *235 a check in the amount of $ 13,284.21. The letter was written on Calini letterhead. Petitioner claims to have received $ 13,000 in installment payments from Preferred in March 1983. SLC's cash receipts journal does not contain such an entry. In its cash receipts journal, there is recorded for February 1983, receipt of $ 13,284.21 from Calini. Preferred made no other payments to SLC. In mid-1983, SLC foreclosed on the mortgage to Preferred and reacquired the Calini unit weeks. Consequently, the accrued 50-percent finance commission was reversed on the books of SLC. The 70-percent sales commission was not reversed on the books. In the event of default by a third-party buyer, Ilex was obligated by the marketing agreement to attempt to resell the properties without additional commission. In December 1983, SLC and Sunsphere, Inc. (Sunsphere), purportedly entered into an agreement for the sale of all 51 Calini unit weeks for $ 700,000. Sunsphere had been formed a few months prior to the sale by Thomas E. Neal and Marianna Smith, petitioner's sister. SLC took back a nonrecourse mortgage note and deed from Sunsphere for the full amount of the purchase price. Under the mortgage *236 note, Sunsphere was required to make its first payment for the property 9 months later, in September 1984. On December 30, 1983, SLC executed a warranty deed in favor of Sunsphere. This warranty deed states that it conveys "An undivided 1/51st interest in and to Condominium Unit Number(s) 403" rather than all 51 unit weeks. [6] SLC accrued finance commissions payable to Ilex of $ 327,610. On January 15, 1984, SLC received notice of a foreclosure action by Goldome Savings Association f.k.a. Guaranty Savings and Loan Association on the Calini development. Sunsphere subsequently quitclaimed the property back to SLC in September 1984, before Sunsphere had made any payments on the property. At the time SLC acquired the time-share units from Calini, SLC acquired a title insurance binder from First American Title Insurance Co. (First American). First American's title commitment did not indicate the presence of any encumbrance *237 on the Calini properties at the time of purchase. First American undertook the defense of SLC's interest in the property and subsequently offered an insurance settlement of $ 130,000 which SLC accepted. The Palm Beach Resorts Transaction
In the latter part of 1982, petitioner and Mr. Neal went to Palm Beach, Florida, to meet with Earl Donaldson, president of Resort-Marketing Associates, Inc. (Resort-Marketing), and Eduard J. de Guardiola, president of Palm Beach Resort Properties, Ltd. (Palm Beach). Once again, a memorandum of understanding was executed. The terms of this memorandum were substantially identical to those of the other two memoranda. This memorandum contemplated the sale by Palm Beach of 62 unit weeks to SLC for 17 percent of the designated retail price or $ 102,000. Similar to the Atlantic and Calini memoranda, the Palm Beach memorandum contained the marketing and submarketing agreements at commissions of 70 and 65 percent, dependent upon sales' qualifying as installment sales under the Internal Revenue Code. The submarketing agreement was between Ilex and Palm Beach and Palm Beach's designated sales agent, Resort-Marketing. The memorandum also contained *238 the accrual method accounting requirement and the requirement that all the unit weeks be sold at retail before yearend. The rights and obligations with respect to the properties were apportioned as in the previous memoranda. [7]
Title insurance on the property was obtained in favor of SLC. Palm Beach executed a warranty deed to the unit weeks in favor of SLC on December 15, 1982. Three of these unit weeks were purportedly sold to James Donaldson, the son of Earl Donaldson, on December 29, 1982. SLC executed a warranty deed in his favor. SLC also took back a nonrecourse mortgage, deed, and security agreement for the entire purchase price of $ 17,700. When this transaction occurred, SLC accrued the 70-percent sales commission payable and the 50-percent finance commission payable in the amounts of $ 12,390 and $ 5,496, respectively. Likewise, Ilex accrued commissions receivable. No *239 other Palm Beach units were sold in 1982. James Donaldson failed to make any payment pursuant to his obligation to SLC. SLC repossessed the unit weeks in 1983. In 1983, SLC purported to sell 16 Palm Beach unit weeks to individuals. SLC accrued sales and finance commissions on the $ 85,200.39 in purported sales, i.e., $ 59,640 and $ 19,777, respectively. The unit weeks sold were not part of those purportedly purchased under the terms of the memorandum of understanding. In 1984, Palm Beach filed bankruptcy and the trustee ran the property for a substantial period of time. SLC filed a proof of claim with the bankruptcy court on April 16, 1984. As a result, SLC was made a priority creditor with respect to the rent earned on the unsold unit weeks SLC had purchased from Palm Beach. SLC received one check in 1985 in the amount of $ 638.05 representing rent on the unsold Palm Beach units. Based on the Atlantic, Calini, and Palm Beach transactions in 1982, SLC accrued and deducted on its Federal income tax return a total of $ 1,158,465 in sales commissions and $ 670,159 in finance commissions. SLC also accrued and deducted petitioner's travel expenses related to the above-described *240 transactions in 1982 in the amount of $ 11,747. In his notice of final partnership administrative adjustment, respondent disallowed all SLC's accrued sales and finance commissions in 1982 and 1983 with respect to the Atlantic, Calini, and Palm Beach properties. [8]
OPINION The first issue for decision is whether SLC may deduct accrued sales and finance commissions for taxable years 1982 and 1983 based upon the purported sales of the condominium time shares in those years. An expense may not be deducted under the accrual method of accounting until "all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." United States v. Hughes Properties, Inc., 476 U.S. 593, 600-601 (1986); *241 Burnham Corp. v. Commissioner, 90 T.C. 953, 955 (1988), affd. 878 F.2d 86 (2d Cir. 1989); sec. 1.461-1(a)(2), Income Tax Regs. Respondent argues that the sales giving rise to accrual of the commissions were shams and that the sales should not be given effect for tax purposes. Petitioner argues that the sales were bona fide. Petitioner bears the burden of proof. Rule 142(a); Kirchman v. Commissioner, 862 F.2d 1486, 1490 (11th Cir. 1989). A transaction is treated as a sham for tax purposes if the transaction was motivated by no business purpose other than obtaining tax benefits and has no economic substance. There is no economic substance where no reasonable possibility of a profit exists. Kirchman v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Hilton v. Commissioner, 74 T.C. 305, 349-350 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). It is well established that the economic substance of a transaction purporting to *242 be a sale, not its form, governs for Federal income tax purposes. In Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978), the Supreme Court summarized the principles underlying this doctrine as follows: In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," Commissioner v. Tower, 327 U.S. 280, 291 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding." Helvering v. Lazarus & Co., 308 U.S., at 255. See also Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 266-267 (1958); Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. Commissioner v. Duberstein, 363 U.S. 278, 286 (1960). *243 Consequently, to be recognized for tax purposes a transaction must have a purpose and substance apart from anticipated tax consequences. Knetsch v. Commissioner, 364 U.S. 361, 365-370 (1960); Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Elliott v. Commissioner, 90 T.C. 960, 970 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990). The transactions at issue here appear to be a variation of the shopworn tax avoidance scheme of purchasing a property owner's deductions. In the past, this was typically accomplished via sale-leaseback transactions financed on a nonrecourse basis. See Hines v. United States, 912 F.2d 736 (4th Cir. 1990); Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987); Rice's Toyota World, Inc. v. Commissioner, supra.In the instant case, petitioner has replaced the usual purchase price, consisting of a small cash payment plus nonrecourse financing, *244 with a "purchase price" totaling 17 percent of retail value plus an accrued liability for "sales commissions" payable equaling 70 percent of the properties' "retail sales price" [9] and an accrued liability to pay 50 percent of the interest payments due from the ultimate retail buyers. The leaseback has been replaced by the partnership's "retail sale" of the properties to entities related to the original owner/seller of the property, all of which were required to occur within a few weeks so that the "sales commissions" could be accrued by the partnership during 1982. The vital component of this tax-avoidance scheme was the accrual of retail sales commissions and 50 percent of the interest to be paid by retail installment purchasers. These accruals, in turn, depend on the existence of bona fide retail sales. Respondent argues that these sales were simply the last in a series of sham sales and agreements *245 entered solely for the purpose of securing tax benefits. Our analysis will proceed chronologically, first examining the purported purchases of the properties by SLC, then examining the purported sales of those same properties by SLC. Petitioner has failed to prove that SLC's purported purchases of the time-share units had economic substance. Atlantic, Calini, and Palm Beach each had the typical benefits and burdens of ownership prior to the sales to SLC. They held an inventory of time-share units, which in order to be sold, had to be sold by Atlantic, Calini, and Palm Beach, themselves. All three original owners were responsible for maintenance and insurance on the properties, as well as any damages arising from the default of an ultimate purchaser. After the sale to SLC, Atlantic, Calini, and Palm Beach still had responsibility to sell the units, as well as responsibility for maintenance and insurance. They also appear to have remained responsible for any losses due to default by retail purchasers, pursuant to a provision in the memoranda of understanding providing that SLC could require them to swap a unit upon which a buyer had defaulted for one of equal value. Consequently, *246 SLC did not bear the burdens of ownership of the properties purportedly purchased pursuant to the memoranda of understanding. Under the memoranda of understanding, SLC was entitled to rents generated by the properties between the time of purchase and the time of resale. However, none of the properties were deeded to SLC prior to December of 1982, and the terms of the memoranda required that the properties be resold prior to December 31 of the same year. Consequently, the accretion of any significant rental revenue to SLC was made a practical impossibility by the terms of the memoranda. The terms of the agreement under which SLC purportedly bought the units required that it pay a "purchase price" of 17 percent of retail value plus a 70-percent sales commission on resale. Sixty-five percent of this sales commission was to be ultimately paid to the original seller. In addition, SLC was to pay 50 percent of all installment interest received from retail purchasers to Ilex. Since the properties were to be sold at the designated retail price within the same month that SLC acquired them, any potential for gain through appreciation was foreclosed. Retail sales of all these units to *247 unrelated parties within such a short period of time would appear to be highly unlikely, if not impossible. Indeed, if it were otherwise, there would appear to be no logical reason why Atlantic, Calini, and Palm Beach would have "sold" the units to SLC and, at the same time, obligated themselves to sell all the same units for SLC by the end of the year at the agreed upon retail value. It is thus logical to conclude that all parties to these transactions anticipated that the "retail sales", which were to occur prior to the end of 1982, would be contrived. Even after SLC's "purchases", the original owners retained the right to encumber up to 50 percent of the value of the property. Consequently, the only real benefits flowing to SLC from "owning" the time-share units were tax benefits stemming from the transactions, not benefits resulting from actual command over the properties. We find that petitioner has also failed to prove that any of the purported sales of the time-share units in 1982 had any substance. Petitioner has failed to offer evidence that there was any substance to the purchasing entities, that they had any assets, or that SLC or Ilex ever checked their financial *248 status. Martin L. Schuman, Jr., signed the purchase contracts as president of Town & Shore. Martin L. Schuman, Jr., was also president of Atlantic from whom SLC had just purchased the same properties. Town & Shore made no downpayment and the entire "purchase" was purportedly financed with a nonrecourse note. Petitioner failed to establish the extent to which Town & Shore made any payments on the note. Petitioner failed to show that a deed was ever executed in favor of Town & Shore. With respect to the "purchases" by Preferred, the documents were executed on its behalf by its treasurer, Mr. Schlosser. Under Florida law, a treasurer has no authority to bind a corporation in dealings with third persons unless expressly or impliedly authorized to do so. Ideal Foods, Inc. v. Action Leasing Corp., 413 So. 2d 416, 417 (Fla. Dist. Ct. App. 1982). Petitioner did not establish that Mr. Schlosser had express or implied authority to bind Preferred. We note that Mr. Schlosser was also the accountant for Calini and penned correspondence on behalf of Preferred on Calini's letterhead, and that a payment ostensibly made on Preferred's installment obligation was recorded *249 by SLC as received from Calini. SLC purportedly sold three time-share units to James Donaldson in 1982 and accrued and deducted sales and finance commissions of $ 12,390 and $ 5,496, respectively. James Donaldson was the son of the president of Resort-Marketing, which was the designated sales agent for Palm Beach from whom SLC had just "purchased" the same units. SLC received a nonrecourse note from James Donaldson for the entire purchase price. James Donaldson made no payments on the note. None of the deeds executed by SLC in favor of the purchasers was ever recorded. While failure to record a property deed is not essential to passage of title, failure to record would indicate that the deeds executed did not convey an interest in the property which the buyers felt warranted the protection of recordation. Petitioner has failed to prove there was economic substance to the purported sale of time-share units in 1983. SLC apparently foreclosed on Preferred in 1983 but immediately resold the property to Sunsphere, a corporation which had just been formed by petitioner's attorney and Marianna Smith. Sunsphere never made any payment to SLC. This transaction appears to have been *250 undertaken solely to prevent the limited partners of SLC from having to recapture the deductions taken on their 1982 returns stemming from the sale to Preferred. To the extent SLC purportedly sold Palm Beach units in 1983, petitioner failed to prove that SLC ever purchased or otherwise owned those units. Petitioner relies on Frank Lyon Co. v. Commissioner, 435 U.S. 561, 583-584 (1978), and quotes the following language as descriptive of SLC's activities: where, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * *
Petitioner, however, has not proven that the transactions in this case were "compelled or encouraged by business or regulatory realities". 435 U.S. at 583. Petitioner points to the testimony of Richard Firth, a director of Atlantic, in support of his contention that the transactions were so compelled. *251 Mr. Firth testified with respect to the Atlantic/Town & Shore transaction. Specifically, he stated that the purpose of the purchase by Town & Shore was to keep rent receipts on the time-share units "in house", i.e., with Atlantic, the entity that had the burden of maintenance and insurance expense. The reason that the sale to Town & Shore would constitute bringing receipts back "in house", stems from the identity of interest between Town & Shore and Atlantic. However, this business exigency was one of the parties' own creation and an integral part of the transaction in question. We do not think that the Supreme Court intended to include such self-inflicted exigencies as a factor indicating the bona fides of a given transaction. Petitioner offered no other evidence of business or regulatory realities compelling the Atlantic transaction or the Calini or Palm Beach transactions. Petitioner makes much of the multiple-party aspect of the transaction and the emphasis placed on it in the Supreme Court's opinion in Frank Lyon. However, these transactions have not been established to be "genuine multiple-party" transactions. Town & Shore appears to have been controlled by *252 the same individuals as was Atlantic. The same situation existed with respect to Calini. Sunsphere, which subsequently purchased the Calini properties, was owned equally by petitioner's attorney and petitioner's sister. These entities were used for the purpose of completing the purported sales transactions in accordance with the memoranda of understanding and to create the appearance of "genuine multiple-party" transactions. We think it is clear that none of the purported purchases from SLC at retail sales prices were made with an actual intent to acquire and pay for the time-share units. Why would Town & Shore and Preferred purchase a large number of time-share units at the very end of 1982, at retail sales prices, with full knowledge that SLC had just purchased the same units for 17 percent of what they were paying? The only thing Town & Shore and Preferred could do with these units was to resell them. Since they purchased the units at retail, resale of the time-share units could only be expected to result in large losses after incurring selling expenses. The same would have been true of the retail price "purchases" by James Donaldson and Sunsphere. The only reasonable *253 explanation for these purported purchases was that the "purchasers" were related to, or controlled by, the other persons and entities involved in this scheme. In sum, petitioner has failed to demonstrate that the transactions were genuine multiple-party transactions, motivated or compelled by business or regulatory realities, or that the sales by SLC had any economic substance. Consequently, the "sales" will not be given effect for tax purposes and cannot be used as a basis for deducting accrued sales and finance commissions for taxable years 1982 and 1983. The next issue for decision is whether petitioner's travel expenses, related to the activities of SLC, may be deducted in 1982. Petitioner offered no specific evidence relative to this issue and, apparently, concedes the issue in his reply brief. Decision will be entered for respondent. Footnotes
1. Respondent also determined that the partners were liable for increased interest and additions to tax under secs. 6621(c) and 6661 in his notice of final partnership administrative adjustment (FPAA). Respondent concedes that these determinations were improperly included in the FPAA and that we have no jurisdiction over these issues in this proceeding. ↩
1. This figure includes an adjustment for finance commissions accrued in 1982, which Springs Land Co., Ltd., recaptured in 1983 due to purported default or foreclosure. Because respondent disallowed deduction of the 1982 commissions, respondent made corresponding adjustments for 1983.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. "Owner" in this memorandum is Atlantic.↩
4. Calini had the right to borrow against mortgages on the properties held by SLC rather than against the property itself.↩
5. Presumably, Mr. Darfus and his wife did this in lieu of executing a deed in favor of Calini and having Calini reconvey the property to SLC.↩
6. Mr. Neal and Ms. Smith, who were both attorneys, indicated at trial that the deed was in error.↩
7. The provision regarding the owner's right to borrow against the mortgages held by SLC was the same as in the Calini memorandum.↩
8. On its 1983 return, SLC recaptured finance commissions that had been deducted on its 1982 return. Because respondent disallowed these finance commission deductions for 1982, respondent made corresponding adjustments to 1983. The net effect was to decrease SLC's reported taxable income by $ 16,270 for taxable year 1983.↩
9. Sixty-five percent of the retail sales price was to eventually find its way back to the original owner/seller.↩