UNIVERSAL INSURANCE SERVICES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Universal Ins. Servs. v. Commissioner
Docket No. 18684-90
United States Tax Court
T.C. Memo 1994-192; 1994 Tax Ct. Memo LEXIS 185; 67 T.C.M. (CCH) 2828; April 28, 1994, Filed *185 Decision will be entered under Rule 155. For petitioner: Martha Combellick Patrick. For respondent: Anne Durning. SHIELDS
SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to tax
Sec. Sec.
Sec. Sec. Year
Deficiency 6651 6653(a)(1)
6653(a)(1)(A)
6653(a)(1)(B)
1985
$ 1,978,101
$ 485,304
$ 98,905
-- -- 1986
547,101
-- -- $ 27,355
[1]
Additions to tax
Sec.
Sec.
Year
6653(a)(2)
6661
1985  [2]
$ 31,832
1986  -- 4,869
After substantial concessions by both parties, [1] the issues for decision are: (1) Whether certain insurance premiums accrued by petitioner in the amount of $ 1,463,398 for 1985 and $ 1,126,173 for 1986 as the cost of sales were deductible during 1985 and 1986; (2) whether petitioner is liable for additions to tax for negligence under section 6653(a)(1)[2] and (2) for 1985 and section 6653(a)(1)(A) and (B) for 1986; and (3) whether petitioner is liable for additions *186 to tax for substantial understatements under section 6661. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. *187 Petitioner, Universal Insurance Services, Inc., is an Arizona corporation with its principal place of business in Phoenix. During the years at issue all of petitioner's outstanding stock was owned by Services Holding Co., and in turn all of the outstanding stock of Services Holding Co. was owned by Shane Powell (54 percent), Richard Cerkoney (23 percent), and Michael Chernek (23 percent). These individuals were also the only directors and officers of petitioner. Michael Chernek was petitioner's president. Shane Powell was petitioner's vice president and secretary-treasurer. Shane Powell's father, Ernie Powell, was petitioner's general manager, but was not an officer or director of petitioner. Petitioner maintains its books and records and prepares its Federal income tax returns using the accrual method of accounting. During 1985 and 1986 petitioner's business consisted of acting as a managing general agent for various insurance companies by serving as a middleman between the insurance companies and their agents, and in some cases between the insurance companies and their insureds. It performed all of the functions of an insurance company, including the rating, underwriting, *188 marketing, and issuing of policies, as well as the billing of clients. Petitioner specializes in insurance for the tow truck industry and sanitation truck business. During the years at issue, it was licensed to sell insurance in Arizona and approximately 40 other States. Petitioner reported gross receipts of $ 9,541,923 in 1985 and approximately $ 9 million in 1986. Tow truck insurance is a specialty market, and for several years prior to 1985, petitioner obtained its speciality insurance through Chicago Insurance Co. (Chicago). However, at the end of 1984, Chicago canceled its specialty coverage nationwide. This cancellation left petitioner without a specialty carrier. When dealing with a specialty market, it is usually difficult for a managing agent to find an insurance company to provide the necessary coverage. Therefore, upon being unable to find a specialty provider, on January 11, 1985, petitioner, as a general agent, entered into a general agency agreement (agency agreement) with Allied Fidelity Corp. (Allied), for itself and as manager for Allied Fidelity Insurance Co. (Allied Fidelity), Texas Fire & Casualty Co. (Texas Fire & Casualty), and other nonaffiliated insurers *189 (all of which are hereinafter sometimes referred to as the insurance companies). Under the agency agreement, petitioner was appointed general agent for the insurance companies "for the purpose of producing commercial automobile, general liability, property, auto physical damage, and inland marine coverages for towing and recovery operators." The agency agreement further provided that petitioner was to collect the gross premiums from its insureds, keep 24.5 percent of the gross premiums as its commission, and remit the balance of 75.5 percent to Allied. The agency agreement also provided that petitioner was entitled to a bonus commission if the policies it sold were profitable and had less than a specified loss ratio. For the first several months of 1985, premiums on insurance policies sold by petitioner under its agency agreement with Allied were financed under an agreement with Premium Finance Specialists (Premium Finance). The financing agreement provided that, upon the sale of a policy by petitioner, the insured would make a downpayment to petitioner of 24.5 percent of the insurance premium and Premium Finance would pay the remaining 75.5 percent, less a financing fee to Allied. *190 Premium Finance would then collect the 75.5 percent from the insured. However, before the end of 1985, Premium Finance became concerned with Allied's financial condition and terminated the financing agreement. After an unproductive search to replace Premium Finance, petitioner and Allied entered into an agreement under which petitioner agreed to assume control over the billing of Allied's premiums. Under this agreement, when a policy was sold, petitioner was required to remit to Allied 75.5 percent of the gross premium, whether or not petitioner was able to collect the balance of the premium from the insured. Under the agreement Allied was to provide petitioner with insurance in all the States in which petitioner did business. When petitioner wished to write insurance in a State in which neither Allied Fidelity nor Texas Fire & Casualty was licensed to do business, Allied was required under the agreement with petitioner to contract with a company licensed to do business in that State in order to supply petitioner with an entry into that State's market. Pursuant to this agreement between Allied and petitioner, Allied contracted in 1985 with American Excel Insurance Co. (American *191 Excel) to provide insurance to petitioner in some of the States where neither Allied Fidelity nor Texas Fire & Casualty was licensed. Upon billing an insurance premium, petitioner recorded the premium on its books as an income receivable and simultaneously recorded 75.5 percent of the premium as a cost payable to the insurance carrier. The inclusion of the premium in petitioner's income was dependent only upon petitioner's billing the insured. It was not dependent upon payment of the premium by the insured. By the same token, petitioner recorded the portion of the premium owed to the insurance company (75.5 percent of the gross premium) as a liability to the insurance company when the insured was billed for the premium, without reference to when or whether the premium was paid. The unpaid portion of premiums due to its insurance companies was carried in an "account current" on petitioner's books. The total of this account represented petitioner's liability to its insurance carriers for policies in force at any given date. For the taxable years at issue, the account-current balance at the end of petitioner's year reflected the net premiums due by petitioner to its insurance *192 carriers for policies in effect. In early 1986 Allied Fidelity was experiencing financial difficulties, and as a result, on March 5, 1986, the Marion Circuit Court in Indianapolis, Indiana, entered an order which placed Allied Fidelity in rehabilitation and appointed a rehabilitator for the company. On July 15, 1986, the Marion Circuit Court entered an order placing Allied Fidelity in liquidation and appointing a liquidator for it. During 1986, Allied was also having financial difficulties and, on November 24, 1986, filed a petition for relief under chapter 7 of the Bankruptcy Code (11 U.S.C. secs. 701-766 (1988)). Due to the financial difficulties being experienced by Allied and Allied Fidelity, the Texas Insurance Department and the Indiana Insurance Department filed claims with respect to the premiums due to Allied and Allied Fidelity by petitioner. In order to avoid potential liability to both insurance departments, petitioner on May 8, 1986, filed an interpleader with the Maricopa County Superior Court in Arizona and deposited $ 698,085.82 into a special trust account set up by petitioner's counsel. The $ 698,085.82 deposited in the trust *193 account was computed in the following manner: Petitioner concluded that the gross amount of the premiums due to it on policies it had sold for Allied Fidelity, Texas Fire & Casualty, and American Excel during the months of April 1985 through March 1986 was $ 9,924,032.87. From this amount, petitioner subtracted $ 6,425,845.08, which petitioner computed to be the total amount previously paid by it to these three companies on premiums. Petitioner then subtracted $ 1,917,758.98, which represented amounts which it computed to be due petitioner from Allied and Allied Fidelity. Finally, petitioner subtracted $ 423,223, the balance in its March 1986 account current, and $ 459,119.99, which represented petitioner's computation of the balance due petitioner on the Western World Propacks account sent by petitioner to Allied Fidelity and Texas Fire & Casualty. The balance of $ 698,085.82 was the net deposit in the trust account. While the application of certain items involved in petitioner's computation of the net deposit was disputed by Allied Fidelity, Texas Fire & Casualty, and/or American Excel, the total amount due by petitioner of $ 9,924,032.87 was not contested by any of them. *194 Furthermore, the payments totaling $ 6,425,845.08, which petitioner claimed had been paid on premiums due by petitioner to Allied, Allied Fidelity, and Texas Fire & Casualty, were admitted by the payees, but the application of such payments by petitioner was in dispute. In other words, Allied, Allied Fidelity, and Texas Fire & Casualty did not deny that such payments were made by petitioner. Their contention was that at least some part of such payments by petitioner constituted payment on a stock subscription agreement which petitioner had entered into with Allied Fidelity and was not applicable to premiums due from petitioner. In addition to the controversy over the application of these payments; i.e., whether to insurance premiums or amounts due on the subscription agreement, petitioner withheld approximately $ 1 million from the interpleader fund because petitioner concluded that it had fulfilled certain contingencies set forth in the agreement with Allied. On November 24, 1986, petitioner contributed another $ 1,021,809.48 to the interpleader fund. This additional contribution represented the net amount petitioner concluded it owed to the insurance companies for premiums totaling *195 $ 2,067,189.11 on insurance policies sold by petitioner during the months of April 1986 through September 1986, after deducting $ 1,045,379.63 which petitioner contended constituted offsets owed to petitioner by the insurance companies. The offsets totaling $ 1,045,379.63 were contested by the insurance companies in the interpleader action. In each of the above instances, as well as in certain other instances where relatively smaller amounts were in dispute, petitioner did not place in the interpleader fund the gross amounts claimed by the insurance companies. These amounts were not deposited in the interpleader fund by petitioner upon the advice of petitioner's counsel, who feared that any overpayment by petitioner of a disputed amount might ultimately result in the overpayment by petitioner becoming uncollectible as a general unsecured claim against the insurance companies. On its income tax returns for 1985 and 1986, petitioner claimed deductions for the gross amounts of $ 9,924,032.87 and $ 2,067,189.11, respectively, in insurance premiums it concluded were due the insurance companies. During 1985 and 1986 Ernie Powell, without petitioner's knowledge and approval, supplied *196 insurance to American Lenders. All of petitioner's transactions with American Lenders were handled by Ernie Powell, who was petitioner's general manager, but not an officer or a director of petitioner. Petitioner concedes that it omitted gross income in the amounts of $ 196,612.74 for 1985 and $ 262,352 for 1986. These were receipts from American Lenders, which was in the business of repossessing automobiles. Because of its highly variable volume of business, American Lenders was not billed like the rest of petitioner's clients. Instead, American Lenders would report the number of its repossessions, assess itself an insurance premium for each one, and concurrently pay its premiums to petitioner. There was usually a 2-month lag between the time when American Lenders would repossess a vehicle and when it would report to petitioner and pay the related premium. Because of this anomalous method of payment, receivables from American Lenders were not entered into petitioner's general ledger and did not show up in its income unless they were specially entered. Without petitioner's knowledge or approval, all of the checks issued by American Lenders during 1985 were deposited by Ernie *197 Powell in an account which he opened on or about October 9, 1985, in the name of petitioner with Great Western Bank. The checks issued by American Lenders during 1986 were not negotiated by Ernie Powell or turned over to petitioner. Because of Ernie Powell's misconduct, petitioner had no knowledge of the omitted income. Shane Powell, the son of Ernie Powell, and petitioner's principal stockholder, vice president, and treasurer, was a signatory on the Great Western Bank account opened by Ernie Powell. The account was not authorized by petitioner's board of directors. Shane Powell did not testify at the trial of this matter, but petitioner's bookkeeper testified that she was not aware of the Great Western Bank account or of the checks issued to petitioner by American Lenders; and consequently, the checks were not recorded on petitioner's records or included in petitioner's income tax returns for 1985 and 1986. Petitioner's accountants were unaware of the existence of this account. In 1987, petitioner arranged for its files to be audited to determine the precise amount of its payables. The American Lenders file could not be found at this time. In August 1987, Ernie *198 Powell died suddenly of a heart attack in the airport on the way to a meeting with American Lenders. Petitioner's income tax returns for 1985 and 1986 were prepared by Walker & Armstrong, an independent firm of certified public accountants. When the returns were prepared, the accounting firm was aware of the interpleader action in which petitioner was involved. However, the firm concluded that the cost of the insurance premiums in question was properly accruable by petitioner and prepared petitioner's returns accordingly. Steven Tait, a certified public accountant with Walker & Armstrong, testified that in his opinion the interpleader action filed by petitioner had no effect on the accrual of such costs. OPINION Is Petitioner Entitled To Deduct the Full Amount of Its Cost of Insurance Premiums? Petitioner contends that as an accrual method taxpayer it is entitled to deduct the gross liability it owed at the end of taxable years 1985 and 1986 under its agreement with the insurance companies. Respondent, however, determined, and contends herein, that such deductions are prohibited by the fact that its liability under the agreement was being contested by petitioner. Petitioner *199 has the burden of proof on the issue. Rule 142(a); General Communication Co. v. Commissioner, 33 T.C. 640, 654 (1960); Phillips Petroleum Co. v. Commissioner, T.C. Memo. 1991-257. Petitioner has elected to compute its taxable income under the accrual method of accounting authorized by section 446(c)(2). Under this method, petitioner may deduct expenses in the year in which they are "incurred", sec. 162(a), rather than when they are actually paid. In order to take a deduction under the accrual method, two elements must be met: (1) All the events must have occurred during the taxable year which determine the fact of the liability, and (2) during the taxable year the amount of the liability must be determinable with reasonable accuracy. [3]United States v. Hughes Properties, Inc., 476 U.S. 593 (1986); secs. 1.461-1(a)(2) and 1.446-1(c)(1)(ii), Income Tax Regs. Both of these elements, which constitute what is often referred to as the "all events" test, must be satisfied by petitioner in order to be entitled to the deduction. Burnham Corp. v. Commissioner, 90 T.C. 953, 955 (1988), *200 affd. 878 F.2d 86 (2d Cir. 1989). Respondent first contends that, had petitioner actually paid the gross amount of the liability into the interpleader fund, the issue of deductibility would never have arisen. This contention is true, but not applicable to the case before us because, under the accrual method of accounting used by petitioner, the date of payment is not relevant in determining when an expense is deductible. United States v. Hughes Properties, Inc., supra at 604; see also Buckeye International, Inc. v. Commissioner, T.C. Memo. 1984-668. Respondent next contends that petitioner is not entitled to the deductions claimed for the gross amounts used by petitioner to determine petitioner's deposits to the interpleader account because such gross amounts were being contested *201 by petitioner during the tax years involved. It is well established that a liability may not be accrued as long as it is contingent. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 519 (1944). Furthermore, respondent contends that, as stated in United States v. Hughes Properties, Inc., supra at 600, "to satisfy the all events test, a liability must be 'final and definite in amount,' * * *, must be 'fixed and absolute,' * * *, and must be 'unconditional,'" (quoting Security Flour Mills Co. v. Commissioner321 U.S. 281, 287 (1944), Brown v. Helvering, 291 U.S. 193, 201 (1934), and Lucas v. North Texas Lumber Co., 281 U.S. 11, 13 (1930)). Petitioner contends that it never disputed the gross amount of its liability to the insurance companies, that even the insurance companies contested only the offsets claimed by petitioner to the gross liability and not the gross liability itself, and that the interpleader action was not filed by petitioner to contest the amount of the gross liability, but to avoid the possible duplication *202 of payments to the interpled parties and in order to avoid the possibility of overpaying the amounts due the insurance companies and being unable to recover the overpayment. We agree with petitioner that it has met the first prong of the all events test; i.e., that during the years in dispute (1985 and 1986) all the events had occurred which determined the fact of petitioner's liability for the gross amount. Therefore, we turn to a consideration of whether petitioner has met the second prong of the test; i.e., whether the amount of petitioner's liability was substantially determined in such years with reasonable accuracy. The agency agreement which petitioner entered into with Allied on January 11, 1985, as manager for the insurance companies, contains a formula for determining the amount of the commissions to which each insurance company was entitled. Thus, the record contains the method of computing the amount of the gross premium liability owed by petitioner to the insurance companies. Furthermore, the record before us contains no evidence that petitioner ever contested the amount of its gross liability. In fact, petitioner's own records reflect the same gross liability as *203 that asserted by the insurance companies; and in its computation of the net amount to be placed in the interpleader fund, petitioner used the correct gross liability as its starting point. At trial petitioner's witnesses testified that the amount of petitioner's gross liability was not contested; and in documents filed with the Maricopa County Superior Court, the insurance companies admitted that the gross liability of petitioner was not in dispute. We conclude, therefore, that during the years at issue the gross liability of petitioner to the insurance companies was substantially determined with reasonable accuracy. This conclusion is supported by the fact that subsequently on February 1, 1991, petitioner and Allied Fidelity entered into a stipulation that the correct gross amount of the premiums owed by petitioner to the insurance companies for 1985 and 1986 was $ 11,161,670. This stipulated amount is more than 93 percent of the gross amount of the premiums which petitioner admitted it owed to the insurance companies for such years; i.e., $ 11,991,221.98, consisting of the $ 9,924,032.87 for the months of April 1985 through March 1986, used by petitioner in the computation of *204 its original interpleader deposit of $ 698,085.22, plus the $ 2,067,189.11 for the months of April 1986 through September 1986, used by petitioner in its computation of the additional interpleader deposit of $ 1,021,809.48 made by petitioner on November 24, 1986. Furthermore, in the case before us, respondent has also stipulated that petitioner is entitled to a substantial portion of the offsets claimed by petitioner in arriving at its interpleader deposits. Therefore, from the record as a whole, we are satisfied and so find that the offsets claimed by petitioner were made in good faith, and not as a surreptitious attempt by petitioner to contest its gross liability. [4] See General Communication Co. v. Commissioner, 33 T.C. 640, 654 (1960). *205 Finally respondent contends that, under section 461(f), petitioner can deduct only that portion of its gross premium liability that is represented by the deposits made to the interpleader fund. With respect to a contested liability claimed as a deduction by an accrual basis taxpayer, section 461(f) reads in part as follows: SEC. 461(f). Contested Liabilities. If -- (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year) determined after application of subsection (h), then the deduction shall be allowed for the taxable year of the transfer. It is noted that section 461(f)(1) specifically limits the application of section 461(f) to cases where the taxpayer contests an asserted liability. Since, as found hereinbefore, petitioner did not contest either the fact of its gross premium liability or the amount thereof, *206 we conclude that section 461(f) by its own terms is not applicable. Therefore, petitioner has met the all events test with respect to its gross premium liability and is entitled to the deductions claimed in the years at issue. Is Petitioner Liable for the Additions to Tax for Negligence? Section 6653(a)(1) provides that if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides for an addition to tax in the amount of 50 percent of the interest payable on that portion of any underpayment of tax which is attributable to negligence. Negligence as used in section 6653(a) is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Taxpayers have a statutory duty to timely file their income tax returns, sec. 6072(a), and the breach of this duty can constitute evidence of negligence. Emmons v. Commissioner, 92 T.C. 342 (1989), affd. *207 898 F.2d 50 (5th Cir. 1990). However, when the addition to tax for negligence is asserted because of the taxpayer's failure to file a timely return, the taxpayer is permitted to rebut the existence of negligence by producing evidence that the delinquency in filing was due to reasonable cause and not to willful neglect. Sec. 6651(a)(1). The record before us contains, and we have set forth in our findings, the numerous significant problems confronted by petitioner during the tax years involved and during the period when the returns for such years were being prepared. We find therefore that, under these circumstances, the delinquency in the filing of the 1985 return was not due to negligence, but instead was due to reasonable cause and not to willful neglect. Respondent determined that petitioner failed to report income in the amounts of $ 196,612.74 for 1985 and $ 348,050.50 for 1986. Petitioner stipulated that it failed to report $ 196,612.74 for 1985 and $ 262,352 for 1986. These amounts represent the checks from American Lenders which were diverted by Ernie Powell to the unauthorized account or uncashed. For 1986, the difference, in the amount of *208 $ 85,698.50, between the amount determined by respondent and the amount conceded by petitioner is unexplained. Failure to fully report income may also constitute negligence. Switzer v. Commissioner, 20 T.C. 759 (1953). While the actions of an employee are normally attributed to the employer, the assumption is that the employee is acting on behalf of the employer. Botwinik Bros. of Mass., Inc. v. Commissioner, 39 T.C. 988 (1963) (fraud of employee not attributed to employer). However, in this case, we have found that the wrongdoing of Ernie Powell in diverting petitioner's income was not undertaken on petitioner's behalf, was not authorized by petitioner, and was done in such a manner as to circumvent petitioner's normal business procedures, which if followed, would have alerted petitioner's officers and accountants to the existence of the unreported income. Under these circumstances, we find that petitioner was not negligent in failing to report the income and conclude that petitioner is not liable for the additions to tax for negligence as a result of the failure to report income diverted by Ernie Powell. For 1986, *209 petitioner has offered no explanation for its failure to report income in the amount of $ 85,698.50. Consequently we hold that the additions to tax for negligence apply for tax year 1986. Is Petitioner Liable for Additions to Tax Under Section 6661 for Substantial Understatement? The final issue for our decision is whether petitioner is liable for the addition to tax under section 6661 for substantial understatement of income tax liability for 1985 and 1986. Section 6661 imposes an addition to tax in an amount equal to 25 percent of any underpayment attributable to a substantial understatement of income tax. Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988). When the taxpayer is a corporation, an understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 10,000. Sec. 6661(b)(1). The deficiencies that we uphold for 1985 and *210 1986 qualify as substantial understatements, as defined in section 6661(b). Under the circumstances, petitioner did not disclose the omission on the return because petitioner was unaware of its existence. Section 6661(c) provides that respondent may waive all or part of the addition to tax on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith. The regulations establish circumstances taken into account in determining whether to waive the penalty: In making a determination regarding waiver of the penalty under section 6661, the most important factor in all cases not described in paragraph (c) of this section will be the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law. * * * In addition, circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the * * *knowledge * * * of the taxpayer. * * * Reliance on * * * the advice of a professional (such as an appraiser, an attorney, or an accountant) would not necessarily constitute a showing of reasonable cause and good *211 faith. Similarly, reliance on facts that, unknown to the taxpayer, are incorrect would not necessarily constitute a showing of reasonable cause and good faith. Reliance on * * * professional advice, or other facts, however, would constitute a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * * [Sec. 1.6661-6(b), Income Tax Regs.] Respondent's waiver of the section 6661 addition to tax is discretionary. We should give due deference to respondent's discretion. Cloud v. Commissioner, 97 T.C. 613, 631 (1991). We have held, however, that this Court has the authority to review respondent's failure to grant such a waiver. The appropriate standard of review is whether respondent has abused her discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). The most important factor in determining whether the addition to tax applies is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability under the law." Sec. 1.6661-6(b), Income Tax Regs. The U.S. Court of Appeals for the Ninth Circuit, to which *212 an appeal in this case would lie, has held in Vorsheck v. Commissioner, 933 F.2d 757 (9th Cir. 1991), affg. in part revg. in part an unpublished order of this Court, that, where the taxpayers acted according to the "ordinary prudent person" standard under the circumstances, reliance upon the advice of an accountant was reasonable and in good faith under all the circumstances, sec. 1.6661-6(b), Income Tax Regs. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Consequently, under these circumstances, the Court of Appeals held that the section 6661 penalty should have been waived. We find that petitioners have met this standard and that respondent abused her discretion in failing to waive the section 6661 addition. We hold that, under this unusual set of facts, where part of petitioner's income was diverted into an unauthorized account and then the employee who made the deposits suddenly died, petitioner was not negligent in failing to report the receipt of the income. Petitioner had procedures in place to insure the proper reporting of income and *213 relied on its certified public accountants to prepare accurate tax returns. Petitioner made an honest effort to determine its income under the law, both in the case of the accrual of payables and in the matter of making all reasonable efforts to determine its receipts. The failure to report the income in question resulted from an honest misunderstanding of fact, which under the circumstances was reasonable. We hold that respondent abused her discretion in failing to abate the addition to tax under section 6661. Decision will be entered under Rule 155. Footnotes
1. 50 percent of interest due on $ 547,101.↩
2. 50 percent of interest due on $ 1,978,101.↩
1. Respondent concedes that the decrease determined in petitioner's cost of sales for 1985 in the amount of $ 3,979,398 should be reduced to $ 1,463,398. Petitioner concedes that it omitted gross income in the amount of $ 196,612.74 for 1985 and $ 262,352 for 1986 and that for 1985 it is liable for an addition to tax under sec. 6651(a)(1) for failing to file a timely income tax return. Respondent also concedes that the interest-based part of the negligence penalty under sec. 6653(a)(2) for 1985 and sec. 6653(a)(1)(B)↩ for 1986 is applicable only to that portion of underpayments attributable to omitted income.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Neither party claims that the "economic performance" rule of sec. 461(h)↩ has any bearing on the amount or timing of the deductions in this case.
4. Having found that the gross liability in the case before us is substantially fixed, we also conclude that other uncertainties not related to such liability do not destroy the deduction. See Washington Post Co. v. United States, 186 Ct. Cl. 528, 405 F.2d 1279↩ (1969).