# UNITED STATES v. HUGHES PROPERTIES, INC.

No. 85–554.   Argued April 23, 1986—Decided June 3, 1986

594

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 607.

*Albert G. Lauber, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Olsen, Richard Farber*, and *William A. Whitledge*.

*O. Clayton Lilienstern* argued the cause for respondent. With him on the brief was *Denton N. Thomas*.*

---

*Briefs of *amici curiae* urging affirmance were filed for the Atlantic City Casino Association by *Herbert J. Miller, Jr.*, and *David O. Stewart;*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the deductibility for federal income tax purposes, by a casino operator utilizing the accrual method of accounting, of amounts guaranteed for payment on "progressive" slot machines but not yet won by playing patrons.

## I

### A

There is no dispute as to the relevant facts; many of them are stipulated. Respondent Hughes Properties, Inc., is a Nevada corporation. It owns Harolds Club, a gambling casino, in Reno, Nev. It keeps its books and files its federal income tax returns under the accrual method of accounting. During the tax years in question (the fiscal years that ended June 30 in 1973 to 1977, inclusive), respondent owned and operated slot machines at its casino. Among these were a number of what are called "progressive" machines. A progressive machine, like a regular one, pays fixed amounts when certain symbol combinations appear on its reels. But a progressive machine has an additional "progressive" jackpot, which is won only when a different specified combination appears. The casino sets this jackpot initially at a minimal amount. The figure increases, according to a ratio determined by the casino, as money is gambled on the machine. The amount of the jackpot at any given time is registered on a "payoff indicator" on the face of the machine. That amount continues to increase as patrons play the machine until the jackpot is won or until a maximum, also determined by the casino, is reached.

The odds of winning a progressive jackpot obviously are a function of the number of reels on the machine, the number of positions on each reel, and the number of winning symbols. The odds are determined by the casino, provided only that

for New York Life Insurance Co. by *Matthew J. Zinn* and *J. Walker Johnson;* and for Transamerica Corp. by *W. Reece Bader* and *Cameron W. Wolfe, Jr.*

there exists a possibility that the winning combination of symbols can appear.[1]

The Nevada Gaming Commission closely regulates the casino industry in the State, including the operation of progressive slot machines. In September 1972, the Commission promulgated § 5.110 of the Nevada Gaming Regulations. See App. 55. This section requires a gaming establishment to record at least once a day the jackpot amount registered on each progressive machine. § 5.110.5. Furthermore,

> "[n]o payoff indicator shall be turned back to a lesser amount, unless the amount by which the indicator has been turned back is actually paid to a winning player, or unless the change in the indicator reading is necessitated through a machine malfunction, in which case an explanation must be entered on the daily report as required in subsection 5." § 5.110.2; App. 55.

The regulation is strictly enforced. Nevada, by statute, authorizes the Commission to impose severe administrative sanctions, including license revocation, upon any casino that wrongfully refuses to pay a winning customer a guaranteed jackpot. See Nev. Rev. Stat. § 463.310 (1985).

It is respondent's practice to remove the money deposited by customers in its progressive machines at least twice every week and also on the last day of each month. The Commission does not regulate respondent's use of the funds thus collected, but, since 1977, it has required that a casino maintain a cash reserve sufficient to provide payment of the guaranteed amounts on all its progressive machines available to the public. Nev. Gaming Regs. § 5.110(3); App. 56.

---

[1] A 1976 study of the 24 four-reel progressive machines then in operation at respondent's casino revealed that the average period between payoffs was approximately 4½ months, although one machine had been in operation for 13 months and another for 35 months without a payoff as of September 1, 1976. The payoff frequency of the other 22 machines ranged from a high of 14.3 months to a low of 1.9 months.

B

At the conclusion of each fiscal year, that is, at midnight on June 30, respondent entered the total of the progressive jackpot amounts shown on the payoff indicators as an accrued liability on its books. From that total, it subtracted the corresponding figure for the preceding year to produce the current tax year's increase in accrued liability. On its federal income tax return for each of its fiscal years 1973, 1974, 1975, and 1977, respondent asserted this net figure as a deduction under § 162(a) of the Internal Revenue Code of 1954, as amended, 26 U. S. C. § 162(a), as an ordinary and necessary expense "paid or incurred during the taxable year in carrying on any trade or business."[2] There is no dispute as to the amounts so determined or that a progressive jackpot qualifies for deduction as a proper expense of running a gambling business. See Tr. of Oral Arg. 7.

On audit, the Commissioner of Internal Revenue disallowed the deduction. He did so on the ground that, under Treas. Reg. § 1.461–1(a)(2), 26 CFR § 1.461–1(a)(2) (1985), an expense may not be deducted until "all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." In his view, respondent's obligation to pay a particular progressive jackpot matures only upon a winning patron's pull of the handle in the future. According to the Commissioner, until that event occurs, respondent's liability to pay the jackpot is contingent and therefore gives rise to no deductible expense. Indeed, until then, there is no one who can make a claim for payment. See Tr. of Oral Arg. 11. Accordingly, the Commissioner determined deficiencies in respondent's income taxes for the years in question in the total amount of $433,441.88, attributable solely to the denial of these pro-

---

[2] No deduction was asserted for fiscal 1976 because the aggregate accrued liability at the end of fiscal 1976 was less than that at the end of fiscal 1975.

gressive jackpot deductions. Respondent paid the asserted deficiencies and filed timely claims for refund. When the claims were denied, respondent brought this suit for refunds in the Claims Court.

## C

Each side moved for summary judgment. App. 15, 52. Respondent contended that the year-end amounts shown on the payoff indicators of the progressive slot machines were deductible, claiming that there was a reasonable expectation that payment would be made at some future date, that the casino's liability was fixed and irrevocable under Nevada law, that the accrual of those amounts conformed with generally accepted accounting principles, and that deductibility effected a timely and realistic matching of revenue and expenses.

The Claims Court denied the Government's motion for summary judgment but granted respondent's motion. 5 Cl. Ct. 641 (1984). It concluded that, under the Nevada Commission's rule, respondent's liability to pay the amounts on the progressive jackpot indicators became "unconditionally fixed," *id.*, at 645, at "midnight of the last day of the fiscal year," *id.*, at 647. The final event was "the last play (successful or not) of the machine before the close of the fiscal year, that is, the last change in the jackpot amount before the amount is recorded for accounting purposes." *Id.*, at 645. A contrary result would mismatch respondent's income and expenses. The court acknowledged that, if respondent were to go out of business, it would not owe the jackpot amount to any particular person. *Id.*, at 646. Nevertheless, the jackpot indicator amount "would still continue to be an *incurred* liability fixed by state law, for which [respondent] would continue to be responsible" (emphasis in original). *Id.*, at 645.

The Claims Court further acknowledged that its ruling was in conflict with the decision of the Court of Appeals for the Ninth Circuit in *Nightingale* v. *United States*, 684 F. 2d 611 (1982), having to do with another Nevada casino, but it de-

clined to follow that precedent and specifically disavowed its reasoning. 5 Cl. Ct., at 644–647.

The Court of Appeals for the Federal Circuit affirmed the judgment "on the basis of the United States Claims Court opinion." 760 F. 2d 1292, 1293 (1985). It ruled that, under the accrual method of accounting, an expense is deductible in the tax year in which all the events have occurred that determine the fact of liability and the amount thereof can be determined with reasonable accuracy, and that liability exists "if there is an obligation to perform an act and the cost of performance can be measured in money." *Ibid.* The liability here was not contingent upon the time of payment or the identity of the jackpot winner. Rather, it was fixed by the Commission's regulation. The "contrary conclusion" of the Ninth Circuit in *Nightingale* was noted. 760 F. 2d, at 1293.

Because of the clear conflict between the two Circuits, we granted certiorari. 474 U. S. 1004 (1985).

## II

Section 162(a) of the Internal Revenue Code allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 446(a) provides that taxable income "shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Under the "cash receipts and disbursements method," specifically recognized by § 446(c)(1), a taxpayer is entitled to deduct business expenses only in the year in which they are paid. Treas. Reg. §§ 1.446–1(c)(1)(i) and 1.461–1(a)(1), 26 CFR §§ 1.446–1(c)(1)(i), 1.461–1(a)(1) (1985). The Code also permits a taxpayer to compute taxable income by the employment of "an accrual method." § 446(c)(2). An accrual-method taxpayer is entitled to deduct an expense in the year in which it is "incurred," § 162(a), regardless of when it is actually paid.

For a number of years, the standard for determining when an expense is to be regarded as "incurred" for federal income tax purposes has been the "all events" test prescribed by the Regulations.   See Treas. Reg. § 1.446–1(c)(1)(ii) (accruals in general); § 1.451–1(a) (accrual of income); and § 1.461–1(a)(2) (accrual of deductions).   This test appears to have had its origin in a single phrase that appears in this Court's opinion in *United States* v. *Anderson*, 269 U. S. 422, 441 (1926) ("[I]t is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it").   Since then, the Court has described the "all events" test "established" in *Anderson* as "the 'touchstone' for determining the year in which an item of deduction accrues," and as "a fundamental principle of tax accounting."   *United States* v. *Consolidated Edison Co. of New York*, 366 U. S. 380, 385 (1961) (citing cases).

Under the Regulations, the "all events" test has two elements, each of which must be satisfied before accrual of an expense is proper.   First, all the events must have occurred which establish the fact of the liability.   Second, the amount must be capable of being determined "with reasonable accuracy."   Treas. Reg. § 1.446–1(c)(1)(ii).   This case concerns only the first element, since the parties agree that the second is fully satisfied.

### III

The Court's cases have emphasized that "a liability does not accrue as long as it remains contingent."   *Brown* v. *Helvering*, 291 U. S. 193, 200 (1934); accord, *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, 519 (1944).   Thus, to satisfy the all-events test, a liability must be "final and definite in amount," *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, 287 (1944), must be "fixed and absolute," *Brown* v. *Helvering*, 291 U. S., at 201, and must be "unconditional," *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11, 13 (1930).   And one may say that "the tax law requires that a deduction be deferred until 'all the events' have

occurred that will make it fixed and certain." *Thor Power Tool Co.* v. *Commissioner*, 439 U. S. 522, 543 (1979).

## A

The Government argues that respondent's liability for the progressive jackpots was not "fixed and certain," and was not "unconditional" or "absolute," by the end of the fiscal year, for there existed no person who could assert any claim to those funds. It takes the position, quoting *Nightingale* v. *United States*, 684 F. 2d, at 614, that the indispensable event "is the winning of the progressive jackpot by some fortunate gambler." It says that, because respondent's progressive jackpots had not been won at the close of the fiscal year, respondent had not yet incurred liability. Nevada law places no restriction on the odds set by the casino, as long as a possibility exists that the winning combination can appear. Thus, according to the Government, by setting very high odds respondent can defer indefinitely into the future the time when it actually will have to pay off the jackpot. The Government argues that if a casino were to close its doors and go out of business, it would not owe the jackpots to anyone. Similarly, if it were to sell its business, or cease its gaming operations, or go into bankruptcy, or if patrons were to stop playing its slot machines, it would have no obligation.

## B

We agree with the Claims Court and with the Federal Circuit and disagree with the Government for the following reasons:

1. The effect of the Nevada Gaming Commission's regulations was to fix respondent's liability. Section 5.110.2 forbade reducing the indicated payoff without paying the jackpot, except to correct a malfunction or to prevent exceeding the limit imposed. App. 55. Respondent's liability, that is, its obligation to pay the indicated amount, was not contingent. That an extremely remote and speculative possibility

existed that the jackpot might never be won,[3] did not change the fact that, as a matter of state law, respondent had a fixed liability for the jackpot which it could not escape. The effect of Nevada's law was equivalent to the situation where state law requires the amounts of the jackpot indicators to be set aside in escrow pending the ascertainment of the identity of the winners. The Government concedes that, in the latter case, the liability has accrued, Tr. of Oral Arg. 20–21, even though the same possibility would still exist that the winning pull would never occur.

2. The Government misstates the need for identification of the winning player. That is, or should be, a matter of no relevance for the casino operator. The obligation is there, and whether it turns out that the winner is one patron or another makes no conceivable difference as to basic liability.

3. The Government's heavy reliance on *Brown* v. *Helvering*, 291 U. S. 193 (1934), in our view, is misplaced. That case concerned an agent's commissions on sales of insurance policies, and the agent's obligation to return a proportionate part of the commission in case a policy was canceled. The agent sought to deduct from gross income an amount added during the year to his reserve for repayment of commissions. This Court agreed with the Commissioner's disallowance of the claimed deduction because the actual event that would create the liability—the cancellation of a particular policy in a later year—"[did] not occur during the taxable year," *id.*, at 200, but rather occurred only in the later year in which the policy was in fact canceled. Here, however, the event creating liability, as the Claims Court recognized, was the last play of the machine before the end of the fiscal year,

---

[3] An affidavit of the president of respondent's Harolds Club Division, submitted in the Claims Court in support of respondent's motion for summary judgment, states that all the progressive machine jackpots unpaid as of June 30, 1977, "were subsequently won and paid to customers." App. 62.

since that play fixed the jackpot amount irrevocably. 5 Cl. Ct., at 645. That event occurred during the taxable year.

4. The Government's argument that the fact that respondent treats unpaid jackpots as liabilities for financial accounting purposes does not justify treating them as liabilities for tax purposes is unpersuasive. Proper financial accounting and acceptable tax accounting, to be sure, are not the same. Justice Brandeis announced this fact well over 50 years ago: "The prudent business man often sets up reserves to cover contingent liabilities. But they are not allowable as deductions." *Lucas* v. *American Code Co.*, 280 U. S. 445, 452 (1930). See also *Brown* v. *Helvering*, 291 U. S., at 201–202, and *Lucas* v. *Kansas City Structural Steel Co.*, 281 U. S. 264, 269 (1930). The Court has long recognized "the vastly different objectives that financial and tax accounting have." *Thor Power Tool Co.* v. *Commissioner*, 439 U. S., at 542. The goal of financial accounting is to provide useful and pertinent information to management, shareholders, and creditors. On the other hand, the major responsibility of the Internal Revenue Service is to protect the public fisc. *Ibid.* Therefore, although § 446(c)(2) permits a taxpayer to use an accrual method for tax purposes if he uses that method to keep his books, § 446(b) specifically provides that if the taxpayer's method of accounting "does not clearly reflect income," the Commissioner may impose a method that "does clearly reflect income." Thus, the "Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner* v. *Hansen*, 360 U. S. 446, 467 (1959). See also *Thor Power Tool Co.* v. *Commissioner*, 439 U. S., at 532; *American Automobile Assn.* v. *United States*, 367 U. S. 687, 697–698 (1961). The Regulations carry this down specifically to "the accounting treatment of any item." Treas. Reg. § 1.446–1(a)(1).

Granting all this—that the Commissioner has broad discretion, that financial accounting does not control for tax purposes, and that the mere desirability of matching expenses

with income will not necessarily sustain a taxpayer's deduction, see *American Automobile Assn.* v. *United States*, 367 U. S., at 690; *Thor Power Tool Co.* v. *Commissioner*, 439 U. S., at 541—the Commissioner's disallowance of respondent's deductions was not justified in this case. As stated above, these jackpot liabilities were definitely fixed. A part of the machine's intake was to be paid out, that amount was known, and only the exact time of payment and the identity of the winner remained for the future. But the accrual method itself makes irrelevant the timing factor that controls when a taxpayer uses the cash receipts and disbursements method.[4]

5. The Government suggests that respondent's ability to control the timing of payouts shows both the contingent nature of the claimed deductions and a potential for tax avoidance. It speaks of the time value of money, of respondent's ability to earn additional income upon the jackpot amounts it retains until a winner comes along, of respondent's "virtually unrestricted discretion in setting odds," Brief for United States 31, and of its ability to transfer amounts from one machine to another with the accompanying capacity to defer indefinitely into the future the time at which it must make payment to its customers. All this, the Government says, unquestionably contains the "potential for tax avoidance." See *Thor Power Tool Co.* v. *Commissioner*, 439 U. S., at 538. And the Government suggests that a casino operator could put extra machines on the floor on the last day of the tax year with whatever initial jackpots it specifies and with whatever odds it likes, and then, on the taxpayer's theory,

---

[4] The fact that Congress once briefly adopted statutory provisions that specifically would have permitted a taxpayer to deduct anticipated expenses by a reserve mechanism is hardly significant. See §§ 462(a) and (d)(1)(B) of the 1954 Code as originally adopted, 68A Stat. 158–159, repealed retroactively by the Act of June 15, 1955, ch. 143, §§ 1 and 3, 69 Stat. 134, 135. But see Deficit Reduction Act of 1984, § 91(a), 98 Stat. 598.

could take a current deduction for the full amount even though payment of the jackpots might not occur for many years, citing *Nightingale*, 684 F. 2d, at 615.

None of the components that make up this parade of horribles, of course, took place here. Nothing in this record even intimates that respondent used its progressive machines for tax-avoidance purposes. Its income from these machines was less than 1% of its gross revenue during the tax years in question. See App. 35–36. Respondent's revenue from progressive slot machines depends on inducing gamblers to play the machines, and, if it sets unreasonably high odds, customers will refuse to play and will gamble elsewhere. Thus, respondent's economic self-interest will keep it from setting odds likely to defer payoffs too far into the future.[5] Nor, with Nevada's strictly imposed controls, was any abuse of the kind hypothesized by the Government likely to happen. In any event, the Commissioner's ability, under § 446(b) of the Code, 26 U. S. C. § 446(b), to correct any such abuse is the complete practical answer to the Government's concern. If a casino manipulates its use of progressive slot machines to avoid taxes, the Commissioner has the power to find that its accounting does not accurately reflect its income and to require it to use a more appropriate accounting method. Finally, since the casino of course must pay taxes on the income it earns from the use of as-yet-unwon jackpots, the Government vastly overestimates the time value of respondent's deductions.

6. There is always a possibility, of course, that a casino may go out of business, or surrender or lose its license, or go

---

[5] Respondent also is unlikely to set extremely high initial jackpots on its machines, since that practice would increase the casino's risk. The initial progressive jackpot amount is the casino's money. If a patron gets the winning combination soon after the machine goes into service, the casino will not have time to recoup the initial jackpot from money gambled by the public. Thus, casinos will tend to set rather low initial jackpots, relying on a percentage of the funds gambled by previous players to contribute the bulk of the progressive jackpot.

into bankruptcy, with the result that the amounts shown on the jackpot indicators would never be won by playing patrons. But this potential nonpayment of an incurred liability exists for every business that uses an accrual method, and it does not prevent accrual. See, *e. g.*, *Wien Consolidated Airlines, Inc.* v. *Commissioner*, 528 F. 2d 735 (CA9 1976). "The existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not." *Helvering* v. *Russian Finance & Constr. Corp.*, 77 F. 2d 324, 327 (CA2 1935). And if any of the events hypothesized by the Government should occur, the deducted amounts would qualify as recaptured income subject to tax. Treas. Reg. § 1.461–1(a)(2).

7. Finally, the result in *United States* v. *Anderson*, 269 U. S. 422 (1926), a case to which the Government makes repeated reference, is itself instructive. The issue there was the propriety of the accrual of a federal munitions tax prior to its actual assessment. The assessment was required before the tax became due. The Government's position, in contrast to its position in the present case, was that the tax liability accrued before assessment. The Court held that the absence of the assessment did not prevent accrual of the tax. It recognized that the taxpayer's "true income for the year . . . could not have been determined without deducting . . . the . . . expenses attributable to the production of that income during the year." *Id.*, at 440. One of the expenses that necessarily attended the production of munitions income was the commitment of a particular portion of the revenue generated to a "reserve for munitions taxes." *Ibid.* Similarly, one of the expenses that necessarily attends the production of income from a progressive slot machine is the commitment of a particular portion of the revenue generated to an irrevocable jackpot. Respondent's true income from its progressive slot machines is only that portion of the money gambled which it is entitled to keep.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE joins, dissenting.

Unlike the Court, see *ante*, at 605–606, I believe that the distinction between the nonpayment of an existing obligation and the nonexistence of an obligation is of controlling importance in this case.

It is common ground that the taxpayer can accrue as a deduction the jackpots in its progressive slot machines only if "all the events have . . . occurred which fix the liability." Treas. Reg. § 1.461–1(a)(2), 26 CFR § 1.461–1(a)(2) (1985). See, *e. g.*, *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, 284, 287 (1944); *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, 519 (1944); *Brown* v. *Helvering*, 291 U. S. 193, 200–201 (1934). See generally *United States* v. *Consolidated Edison Co. of New York*, 366 U. S. 380, 385–386 (1961). The question is whether an "obligation" created by the rules of a state gaming commission and defeasible at the election of the taxpayer is "fixed" within the meaning of the Treasury Regulation. To me, the answer is clearly "no."

"Under Nevada law," if the taxpayer in this case "were to surrender its gaming license, it would no longer be subject to the gaming laws and regulations and could thus avoid the payment of the liability." App. 23. Thus, "the bankruptcy of the [taxpayer], or the surrender of its gaming license could relieve it of its obligation." *Id.*, at 44.

On these facts, the taxpayer has no present liability to accrue. Rather, the taxpayer's obligation to pay the jackpots in this case resembles the taxpayer's obligation to pay the cost of overhauling its aircraft engines and airframes in *World Airways, Inc.* v. *Commissioner*, 62 T. C. 786 (1974), aff'd, 564 F. 2d 886 (CA9 1977). In that case, the Tax Court held that the taxpayer, an airline, did not satisfy the "all events" test and hence could not accrue and deduct any portion of these costs, 62 T. C., at 802, 805—despite the existence of contracts obligating the taxpayer to pay, upon the completion of an overhaul, an amount for each hour of

flight time since the previous overhaul, *id.*, at 791–793, and a statutory obligation to overhaul its engines and airframes after a specified number of flight hours, *id.*, at 803. Of critical importance to the decision before us today, the court distinguished between the *nonpayment* of a legal obligation and the *nonexistence* of an obligation by considering the taxpayer's liability in the event of a bankruptcy:

> "The bankruptcy of petitioner [the taxpayer] or the crash or permanent grounding of an aircraft might conceivably relieve petitioner of the payment of overhaul costs. The occurrences of any of these contingencies, however, would not relieve petitioner of an *existing* obligation to pay any overhaul costs. Rather, the occurrence would mean that no obligation to pay would ever come into existence. Petitioner has not shown that its liability for the accrued overhaul costs was absolutely fixed in the year of accrual. The contingencies referred to would act to prevent a potential liability from coming into existence." *Id.*, at 804 (emphasis in original).

The court recognized that the risk of bankruptcy or disaster was remote. But it added that "there exists another contingency whose occurrence is not unlikely": "Petitioner has sold five piston aircraft and one jet aircraft since 1965. The five piston aircraft owned by petitioner during 1965, and 1966, were sold prior to the time when major airframe overhaul was required." *Ibid.*

Here, too, the taxpayer has no obligation that could be discharged in a bankruptcy court—a fact that confirms that it has no present liability to pay the jackpots on its progressive slot machines. And there likewise exists a contingency under which it is not at all unlikely that a slot machine owner would elect to escape its liability. If the gross amount of the accruals on these machines should ever exceed the net value of the business—perhaps as a result of shrewd management—it could liquidate at a profit without having any liabil-

ity to anyone for what the Court mistakenly describes as a "fixed liability." By simply tendering its gaming license the taxpayer would avoid its liability on the jackpots. This option is exercisable in the sole discretion of the taxpayer at any point in time. My research has revealed no other instance in which the Commissioner has been forced to allow accrual of a deduction when the expense deducted may be avoided entirely at the election of the taxpayer. This feature of the deduction before us unquestionably contains the "potential for tax avoidance," *Thor Power Tool Co.* v. *Commissioner*, 439 U. S. 522, 538 (1979), and I think it lies well within the Commissioner's authority to interpret the Regulation to forbid it, see *Lucas* v. *American Code Co.*, 280 U. S. 445, 449 (1930). I respectfully dissent.