T.C. Memo. 2005-225

UNITED STATES TAX COURT

DENIS H. DIEKER, JR., AND SHIRLEY J. DIEKER, ET AL.,[1]
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 127-04, 128-04,     Filed September 28, 2005.
            130-04.

Jack D. Flesher, Gregory L. Franken, and Gregg C. Goodwin,
for petitioners.

Ann L. Darnold, for respondent.

MEMORANDUM OPINION

GERBER, Chief Judge:  These cases were consolidated for
purposes of trial, briefing, and opinion.  For 1998 and 1999,

_____

[1]Cases of the following petitioners are consolidated
herewith:  John R. Pierce and Sandee Pierce, docket No. 128-04;
Steven A. Nienke and Vickie L. Nienke, docket No. 130-04.

respondent determined the following deficiencies in petitioners'
Federal income tax:

|                                                | Deficiency |          |
| Petitioners                                    | 1998       | 1999     |
| ---------------------------------------------- | ---------- | -------- |
| Denis H. Dieker, Jr., and Shirley J. Dieker    | $3,911     | $117,495 |
| John R. Pierce and Sandee Pierce               | 3,911      | 117,494  |
| Steven A. Nienke and Vickie L. Nienke          | 32,921     | 988,914  |

After concessions,[2] the sole issue for our consideration is
whether a liability claimed through petitioners' S corporation
met the requirements of the "all-events test" including the
economic performance principles of section 461(h).[3]

## Background

These cases were submitted fully stipulated under Rule 122,
and the stipulated facts are so found.  All petitioners resided
in Kansas at the time their respective petitions were filed.

Collectively, petitioners own National Contractors, Inc.
(National), an S corporation that operates a construction
business in Wichita, Kansas.  At all pertinent times, National
was owned as follows:

---

[2]Petitioners concede the deficiencies for the taxable year
1998 and certain other adjustments to income for the taxable year
1999.

[3]Unless otherwise indicated, all section references are to
the Internal Revenue Code and all Rule references are to the Tax
Court Rules of Practice and Procedure.

| Shareholder | Amount |
|---|---|
| Steven A. Nienke | 60.8% |
| Vickie L. Nienke | 20.0 |
| John R. Pierce | 9.6 |
| Denis H. Dieker, Jr. | 9.6 |
| Total | 100.0 |

On or around August 28, 1997, National contracted with Prairie View Unified School District 362 (the District) to perform construction work at the Prairie View Middle School and Performing Arts Center (construction contract) for $8,144,300. As part of the construction contract, National was required to obtain a performance bond. On or around September 5, 1997, National and Fidelity & Deposit Co. of Maryland (F&D) entered into a separate agreement for an $8,144,300 performance bond (the performance bond). In the event that National failed to complete the construction work for the project, F&D agreed to act as surety to the District and was obligated to complete the project. In addition, in a contemporaneous agreement, petitioners, National, and Midwest Drywall Co., Inc.[4] (collectively the indemnitors), agreed to indemnify F&D for any costs incurred under the performance bond (the indemnity agreement).

On October 22, 1998, the District informed National that it was terminating its employment, asserting that sufficient cause existed under the terms of their contract. At that time, the

---

[4]Midwest Drywall Co., Inc., is a company in which petitioners have an interest.

project had not been completed, and the District had paid National $3,732,732 of the original $8,144,300 contract price. F&D contracted with Crossland Construction Co. to demolish defective construction performed by National and to complete the project in accordance with the specifications under the construction contract.

F&D's counsel and National (through its chairman, petitioner Steven Nienke) exchanged, during 1999, several letters in an attempt to resolve the controversy over the parties' obligations under the performance bond and the indemnity agreement. In a June 30, 1999, letter, F&D's counsel demanded that the indemnitors pay $1 million in costs incurred by F&D and notified National that F&D expected to incur approximately $8 million in additional costs, without considering any payments that might be received from the District under the contract. On July 12, 1999, National acknowledged that F&D was expecting a $4 million performance bond loss, but National also asserted defenses that might obviate its payment of damages. National (and the other indemnitors) also proposed to settle any dispute with F&D for $1 million.

On July 26, 1999, F&D rejected the proposed settlement and made a counterproposal to settle for $3 million, plus interest and any additional unpaid losses. On October 18, 1999, National acknowledged it had obligations under the parties' agreement and

offered to settle for an initial payment of $500,000 and $25,000 each month thereafter until F&D's cost to complete the project had been reimbursed, not to exceed $4 million. On November 9, 1999, National proposed to settle for $5 million, payable from 1999 through 2001, with incentive credits for early payments. Also in the November 9, 1999, letter National admitted that its obligation, at that time, to F&D under the indemnity agreement and the performance bond was over $2,500,000. On November 18, 1999, F&D proposed adjustments to the payment plan and incentive structure, as follows: payments of $5,250,000 from 1999 to 2001 or $4,750,000 if paid in full on or before July 1, 2000. As of December 31, 1999, F&D had incurred over $2,500,000 in its attempt to complete the construction project.

On or around June 22, 2000, F&D sued the indemnitors under the indemnity agreement for $7,296,070, representing the costs F&D incurred to complete the construction project. On October 5, 2000, National agreed to pay $4,638,500 to F&D in two installments, with $2,500,000 to be paid within 2 days after the agreement was signed and $2,138,500 to be paid on or before January 15, 2001. In a separate settlement agreement among National, the District, and F&D, the District agreed to pay F&D a portion of the remaining outstanding amount due under the original construction contract between National and the District.

National timely filed a 1999 Form 1120S, U.S. Income Tax Return for an S Corporation, using the accrual and percentage-of-completion methods of accounting. National claimed a $2 million reduction of income in the form of cost of goods sold, which represented the amount owed by National to F&D under the indemnity agreement. Thereafter, National filed an amended Form 1120S, claiming an additional $500,000 reduction of gross income, thereby increasing the reduction to $2,500,000. Petitioners timely filed their 1999 Federal income tax returns claiming their proportionate shares of the $2,500,000 reduction of income.

## Discussion

The parties agree that as of December 31, 1999, National was obligated to F&D for the reasonable costs incurred by F&D, as surety under the performance bond, to complete the construction project. The parties also agree that, as of December 31, 1999, National admitted that it had an obligation to F&D of more than $2,500,000. The parties disagree as to whether National's obligation, as of December 31, 1999, met the all-events test for accrual, including the requirements of section 461(h). To decide this issue, we must determine, as of December 31, 1999, whether: (1) The fact of a liability could be determined, (2) the amount of that liability could be determined with reasonable accuracy, and (3) economic performance occurred with respect to that liability.

Generally, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner under section 7491 in certain circumstances. Petitioners do not contend and have not established that section 7491(a) applies in this case. Accordingly, petitioners must show their entitlement to the claimed deductions. See Rule 142(a).

The taxpayer's method of tax accounting determines the taxable year for which deductions are proper. Sec. 461(a). National elected the accrual method of accounting, which is a permitted tax accounting method. Sec. 446(c)(2). Generally, an accrual method taxpayer is entitled to a deduction in "the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, and economic performance has occurred with respect to the liability." Secs. 1.446-1(c)(1)(ii)(A), 1.461-1(a)(2)(i), Income Tax Regs.; see sec. 461(h)(1), (4); Weaver v. Commissioner, 121 T.C. 273, 276 (2003).

In their briefs, the parties denominated the disputed $2,500,000 a "deduction", in spite of National's treatment of the item as "cost of goods sold". Cost of goods sold, however, is used to reduce sales receipts to arrive at gross income; it is

not a deduction from gross income.[5]  See sec. 1.61-3(a), Income
Tax Regs.  Despite this contradiction, under the accrual method,
the economic performance requirement must be met for an item to
be deducted or included in cost of goods sold.  Secs. 1.446-
1(c)(1)(ii)(B), 1.61-3(a), Income Tax Regs.  Accordingly, we look
to whether economic performance has occurred with respect to the
$2,500,000 obligation.[6]

1.  All-Events Test

In order for petitioners to be entitled to deduct their
portion of the $2,500,000 passthrough from National, they must
show that the item meets the requirements of the all-events test.
To satisfy that test, they must show (1) that all events have
occurred which determine the fact of a liability and (2) that the
amount of the liability can be determined with reasonable
accuracy.  Sec. 461(h)(4); see Restore, Inc. v. Commissioner,
T.C. Memo. 1997-571, affd. 174 F.3d 203 (11th Cir. 1999); Spitzer
Columbus, Inc. v. Commissioner, T.C. Memo. 1995-397.

----

[5]The parties stipulated that National reported the liability
as part of cost of goods sold.  Petitioners, however, on brief
contend that the only description of the $2,500,000 item was on
the amended Form 1120S as "PY Accrued Loss on Liability".  The
distinction petitioners make is of no consequence because the
standard for accrual is the same irrespective of whether the item
is a deduction/loss or part of cost of goods sold.

[6]The parties have not indicated that the amounts of the
redetermined deficiencies will depend upon whether the $2,500,000
item is determined to be a deduction or part of cost of goods
sold.  Accordingly, we find it unnecessary to decide that
question.

a. <u>Fact of Liability</u>

For an item to be deductible, the fact of liability must be "firmly established", "fixed and certain", and "fixed and absolute". <u>Colonial Wholesale Beverage Corp. v. Commissioner</u>, T.C. Memo. 1988-405 (and cases cited therein), affd. 878 F.2d 23 (1st Cir. 1989). It is well established that liabilities may not be accrued while they are still contingent. <u>Vastola v. Commissioner</u>, 84 T.C. 969, 977 (1985) (and cases cited therein). However, a contingency limited to the timing of the required payment may not prevent an item from satisfying the all-events test. <u>Restore, Inc. v. Commissioner</u>, <u>supra</u> (citing <u>United States v. Hughes Props., Inc.</u>, 476 U.S. 593, 604 (1986)). Respondent contends that the litigation and the related correspondence between National and the other litigants indicate that the liability remained in dispute into 2000 and thus remained contingent on December 31, 1999.

Respondent is correct to the extent that the correspondence between F&D and National before October 18, 1999, reflected a continuing dispute regarding whether National was liable to F&D under the indemnity agreement, and that National was making a settlement offer in hopes of avoiding litigation. Contrary to respondent's contention, however, all of the correspondence beginning with the October 18, 1999, letter, indicates that National recognized an obligation to F&D under the indemnity

agreement. In that regard, petitioners and respondent stipulated that National acknowledged by the end of taxable year 1999 that it had an obligation to F&D under the indemnity agreement. Following the October 18, 1999, letter, the remaining differences focused mainly upon the aspects of payment, such as timing, an aspect that will not prevent the items from satisfying the all-events test. See United States v. Hughes Props., Inc., supra at 604. The fact that the litigation was not resolved does not, ipso facto, indicate that National disputed whether it had an obligation under the indemnity agreement. It should be noted that the parties to this case stipulated that National recognized its obligation to F&D under the indemnity agreement by the end of 1999. National and F&D's continuing disagreement concerned aspects of the terms of the obligation. However, the existence of the liability was not contested and could be established with reasonable certainty.

In this case, all of the events had occurred to establish a liability: F&D and National entered into an indemnity agreement, circumstances arose necessitating performance under the indemnity agreement, and National was obligated to pay F&D under the indemnity agreement. Accordingly, the $2,500,000 claimed reduction to income was not a "contingent" liability, as respondent contends. The fact of liability could be established as of December 31, 1999.

b.  Amount of the Liability

The amount of the liability must be determinable with reasonable accuracy.  Sec. 461(h)(4).  Respondent argues that at the end of 1999, there was disagreement as to the amount National would be required to pay.  We hold that any uncertainty that remained as of December 31, 1999, was insufficient to preclude a deduction for 1999.

The regulations address uncertainty as to the amount of a liability as follows:

> While no liability shall be taken into account before economic performance and all of the events that fix the liability have occurred, the fact that the exact amount of the liability cannot be determined does not prevent a taxpayer from taking into account that portion of the amount of the liability which can be computed with reasonable accuracy within the taxable year.  For example, A renders services to B during the taxable year for which A charges $10,000.  B admits a liability to A for $6,000 but contests the remainder.  B may take into account only $6,000 as an expense for the taxable year in which the services were rendered.  [Sec. 1.461-1(a)(2)(ii), Income Tax Regs.]

As discussed above, National acknowledged that it had an obligation to F&D under the indemnity agreement.  The litigation and the related correspondence between F&D and National reflected that there was disagreement about the total amount for which National might be liable.  However, the November 9, 1999, letter shows that National admitted its obligation was over $2,500,000

under the indemnity agreement.[7]  Even though National acknowledged it was liable for at least $2,500,000 under the indemnity agreement, respondent contends that the total amount of National's liability was uncertain.  The total amount continued to be in dispute because of, among other things, the District's demands regarding completion of the project.  While it is true that National's total obligation with regard to the completed construction remained uncertain at the end of 1999, that did not alter the fact that National's acknowledged minimum obligation to F&D under the indemnity agreement was $2,500,000.  The $2,500,000 constitutes an uncontested amount similar to the $6,000 uncontested amount described in the regulations.  See sec. 1.461-1(a)(2)(ii), Income Tax Regs.  The liability is thus determinable with reasonably accuracy to the extent of the uncontested $2,500,000 amount.

2.  Economic Performance

The all events test will not be treated as met any earlier than when economic performance occurs.  Sec. 461(h)(1).  The occurrence of economic performance depends upon the circumstances underlying a liability or the obligations a liability creates. See sec. 461(h)(2).  In that regard, respondent argues that the liability arose out of National's alleged breach of the indemnity

---

[7]The parties stipulated for purposes of this case that National recognized it had an obligation to F&D of more than $2,500,000 under the indemnity agreement as of Dec. 31, 1999.

agreement.  Petitioners argue that the liability arose because of F&D's performance under the performance bond and the indemnity agreement.  We agree with petitioners.

An analysis of National's contractual obligations under the various agreements is helpful in our consideration of the nature of the $2,500,000 claimed by National.  National and the District entered into the construction contract, which also required National to obtain a performance bond.  National breached its obligation to properly complete the construction contract.  It was not that failure to perform, however, that gave rise to National's $2,500,000 obligation to F&D.  National's failure to perform its construction obligation to the District gave rise to a separate set of contractual obligations between National and F&D.  F&D became obligated to perform under its performance bond with National, which, in turn, caused National to become obligated to indemnify F&D.  As acknowledged by respondent, the consideration in the bond and the indemnity contract was F&D's promise to complete the project, in exchange for National's promise to pay a fee and to indemnify for the costs F&D incurred in its performance under the indemnity agreement.  National's inability to meet its obligations to the District was the condition precedent to F&D's performance.

Respondent contends that the performance bond agreement, in effect, was a third party beneficiary contract under which National received no consideration. Respondent, in making that contention, overlooks the fact that the separate contractual obligations between F&D and National had mutual exchanges of consideration. A third party beneficiary contract is one that directly benefits a third party and that provides the third party with a right to sue the original contracting parties for breach. Black's Law Dictionary 349 (8th ed. 2004). The only potential third party beneficiary in this case would be the District, which might have had a right to sue F&D if F&D had failed to fulfill its obligations under the performance bond. Therefore, F&D agreed to complete National's performance for the project in exchange for National's agreement to reimburse F&D for all costs incurred.

Respondent also contends that National's $2,500,000 obligation arose because of its breach of the indemnity agreement. Respondent therefore asserts that economic performance occurs when payment is made, as described in section 1.461-4(g)(2), Income Tax Regs. However, National only failed to meet its contractual obligation with the District. By December 31, 1999, National and F&D were continuing to negotiate the timing and total amount of payments under the indemnity agreement. No breach of contract had been alleged or occurred.

Respondent, in support of his contention that National breached or failed to perform its contractual obligation to F&D, relies on F&D's allegations of breach of contract in its June 2000 complaint concerning the performance bond and indemnity contract. Respondent's reasoning is unconvincing. F&D's allegations in its June 2000 pleading were made after National acknowledged its $2,500,000 indemnity obligation to F&D. Allegations of breach of contract after the close of 1999 would not affect the status of National's recognition of the liability in 1999. Accordingly, we reject respondent's contention that the liability arose out of a breach of contract.

With respect to the accrual of a deduction arising in connection with the providing of services, economic performance occurs as the services are provided. Sec. 461(h)(2)(A)(i); sec. 1.461-4(d)(2)(i), Income Tax Regs. Services provided to a taxpayer also include services provided to another person at a taxpayer's direction. Sec. 1.461-4(d)(6)(i), Income Tax Regs. We have already decided that the liability arose out of F&D's promise to perform under the performance bond. Respondent contends that if the performance bond and the indemnity agreement are to be considered separate from the construction contract, then we should view F&D's services as having been rendered to the District. In that regard, the work or services performed by F&D in completing the construction contract is a benefit to National,

and economic performance occurs as F&D performs the services; i.e., as F&D completes construction of the project.  The parties stipulated that, as of December 31, 1999, F&D had incurred over $2,500,000 in costs relating to its efforts to complete the project.  Therefore, economic performance had occurred with respect to $2,500,000 during 1999.

3.  Conclusion

Because we have found that the requirements of the all-events test were met in 1999 and that economic performance occurred in 1999, the $2,500,000 liability had accrued and was deductible for National's and therefore petitioners' 1999 tax years.  See sec. 461(h)(1).

Decisions will be entered

under Rule 155.