NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 19 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| THE MORNING STAR PACKING COMPANY, L.P.; THE MORNING STAR COMPANY, Tax Matters Partner, Petitioners-Appellants, v. COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee. | No. 21-71191 Tax Ct. No. 5013-15 MEMORANDUM* |

| | |
|---|---|
| THE MORNING STAR PACKING COMPANY, L.P.; THE MORNING STAR COMPANY, Tax Matters Partner, Petitioners-Appellants, v. COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee. | No. 21-71192 Tax Ct. No. 16684-16 |

| | |
|---|---|
| LIBERTY PACKING COMPANY, LLC; THE MORNING STAR COMPANY, Tax | No. 21-71193 |

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

| | |
|---|---|
| Matters Partner, | Tax Ct. No. 5015-15 |
| Petitioners-Appellants, | |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, | |
| Respondent-Appellee. | |

| | |
|---|---|
| LIBERTY PACKING COMPANY, LLC; THE MORNING STAR COMPANY, Tax Matters Partner, | No.   21-71194 |
| | Tax Ct. No.  16842-16 |
| Petitioners-Appellants, | |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, | |
| Respondent-Appellee. | |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted November 19, 2024
San Jose, California

Before:  GRABER, FRIEDLAND, and BUMATAY, Circuit Judges.
Dissent by Judge BUMATAY.

The Morning Star Packing Company, L.P. and Liberty Packing Company, LLC (collectively, Morning Star) appeal the Tax Court's decision affirming the Commissioner of Internal Revenue's determination that Morning Star's anticipated

expenses for reconditioning failed to satisfy the "fact of liability" prong of the "all events" test. We review de novo whether a taxpayer has satisfied the "all events" test, *Gold Coast Hotel & Casino v. United States*, 158 F.3d 484, 487 (9th Cir. 1998), and affirm.

Under the "all events" test, a liability is incurred, and can be recognized for tax purposes, when "all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy." I.R.C. § 461(h)(4); *see also* Treas. Reg. § 1.461-1(a)(2). To satisfy the "fact of liability" prong of the "all events" test, "the liability must be fixed, absolute, and unconditional." *Gold Coast*, 158 F.3d at 487 (internal citation omitted). "[T]he timing of the moment in which liability [i]s fixed is essential." *Challenge Publ'ns, Inc. v. Comm'r*, 845 F.2d 1541, 1544 (9th Cir. 1988). A taxpayer may not "deduct an estimate of an anticipated expense, no matter how statistically certain, if it is based on events that have not occurred by the close of the taxable year." *United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 243–44 (1987).

Morning Star contends that the final production run of the harvest season fixes a liability to recondition its facilities, relying primarily on its financing agreements as the source of that obligation. We disagree.

To determine whether Morning Star's financing agreements require Morning Star to recondition its equipment, we refer "to contract law principles." *Giant*

3

*Eagle, Inc. v. Comm'r*, 822 F.3d 666, 673 (3d Cir. 2016); *see also Challenge Publ'ns*, 845 F.2d at 1544 (looking to the plain meaning of contract terms to determine the taxpayer's obligations). We therefore must "ascertain the intent of the parties from the language of their agreement[s]." *Johnston v. Comm'r*, 461 F.3d 1162, 1165 (9th Cir. 2006). "Unless a different intention is manifested," we interpret the agreements' language in accordance with its "generally prevailing meaning." *Id.* (quoting Restatement (Second) of Conts. § 202(3) (Am. L. Inst. 1981)).[1]

Morning Star's financing agreements do not expressly require it to recondition its equipment. But Morning Star contends that an obligation can be inferred from the agreements' requirement that Morning Star keep its business property in "good condition and repair, reasonable wear and tear excepted," "good operating order and repair, normal wear and tear excepted," and "good working order and condition, ordinary wear and tear excepted." The agreements do not

---

[1] Some of Morning Star's agreements state that New York law applies, while others are governed by California law. Neither party argues that the analysis hinges on the nuances of state law and, under both New York and California law, courts similarly interpret contract provisions in accordance with their plain meaning. *See Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014) ("The words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning." (citation and internal quotation marks omitted)); *Santisas v. Goodin*, 951 P.2d 399, 405 (Cal. 1998) ("The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." (cleaned up)).

define those terms. But the plain meaning of "wear and tear" is the "[d]eterioration caused by ordinary use." *Wear and tear,* Black's Law Dictionary, 12 ed. 2024.[2] Morning Star does not dispute that its facilities' deterioration is caused by the ordinary use of its equipment, *i.e.*, to process tomatoes. Thus, although Morning Star may decide to recondition its equipment to prepare for another production cycle, its financing agreements do not obligate Morning Star to do so under the plain meaning of the wear and tear exceptions.[3]

Our interpretation also makes practical sense. If Morning Star's lenders needed to repossess the equipment, there is no evidence that lenders would care whether Morning Star reconditioned the equipment; as Morning Star conceded at oral argument, the equipment would at least need to be sterilized again after repossession anyway. By contrast, Morning Star's interpretation strains credulity.

---

[2] Both New York and California courts have applied similar definitions of "wear and tear." *See Superhost Hotels Inc. v. Selective Ins. Co. of Am.*, 75 N.Y.S.3d 124, 126 (N.Y. App. Div. 2018) ("The dictionary definition of 'wear and tear' is the loss, injury, or stress to which something is subjected by or in the course of use." (some internal quotation marks omitted)); *Kanner v. Globe Bottling Co.*, 78 Cal. Rptr. 25, 29 (Ct. App. 1969) (holding that damage that "was attributable to the usual practice and custom of [a commercial lessee] in carrying out its business . . . constituted 'ordinary wear and tear'").

[3] Given our interpretation of the agreements, the Tax Court did not abuse its discretion in denying Morning Star's motions to reconsider and to reopen the record to add three complete copies of its security agreements, all of which contained identical terms regarding maintenance obligations (or lack thereof) as the agreement already in the record. *See Nor-Cal Adjusters v. Comm'r*, 503 F.2d 359, 363 (9th Cir. 1974); *Parkinson v. Comm'r*, 647 F.2d 875, 876 (9th Cir. 1981).

Under its interpretation, Morning Star would be in breach of its agreements for most of the year while it waited to recondition its equipment until right before the next production cycle—which neither Morning Star nor any of its contracting partners has ever said is the case.

Morning Star presses that because its "facilities require between $16.7 million and $21 million in reconditioning costs to restore the facilities to the same operating capability as prior to the start of production," the equipment must be "in a state of disrepair beyond mere 'ordinary wear and tear.'" But the mere total of Morning Star's reconditioning costs does not suggest that its equipment is in disrepair beyond ordinary wear and tear. Indeed, Morning Star acknowledged at oral argument that if another truck of tomatoes arrived at its facilities right after its last production run before production shut down for the season, it could process those tomatoes without reconditioning. Reconditioning is therefore necessary to prepare for the next production cycle, not to repair inoperative equipment.

Morning Star also argues that its contracts with customers suggest that it has a fixed liability for reconditioning, but those contracts are similarly unhelpful to Morning Star. Morning Star concedes that those contracts do "not directly require the reconditioning costs." Instead, Morning Star contends that its commitments to customers provide "a high degree of certainty that the reconditioning costs would in fact be completed." But a high likelihood is not the same as a certain obligation.

6

Morning Star is making "a mere estimate of liability" based on its predicted future tomato sales, which does not create a fixed liability under the "all events" test. *Gen. Dynamics*, 481 U.S. at 244. Morning Star's customer contracts therefore do not support its position.

Because Morning Star does not satisfy the "fact of liability" prong, we need not reach the parties' arguments regarding other parts of the "all events" test.

**AFFIRMED.**

*The Morning Star Packing Co., L.P. v. Commissioner of Internal Revenue*, No. 21-71191+

BUMATAY, Circuit Judge, dissenting:

The Internal Revenue Service ("IRS") has a shocking view of taxpayers' money. According to the IRS's counsel at oral argument, any disagreement on when a tax payment is due constitutes "an interest-free loan from the government" to the taxpayer. That's completely wrong. Simply, the income of everyday Americans is not government property. Taxpayers do not keep their hard-earned income by the grace of the IRS. It's the people's money. And so, if there is a good-faith disagreement on how our complicated tax laws operate, the IRS doesn't get the presumption that the money is theirs at the time it wants it. But then, this view explains much of what has transpired in this case.

The Morning Star Packing Company and Liberty Packing Company (collectively "Morning Star") are two of the largest tomato paste producers in the United States. During its 100-day season, Morning Star runs its production facilities at maximum capacity and operates its equipment 24 hours a day. When the season finishes in October, its equipment is so worn out that it needs extensive reconditioning—to the tune of up to $21 million annually. For efficiency, Morning Star services its equipment shortly before the start of the next year's season. But it deducts the cost of doing so from its income in the previous year, the year in which the equipment was worn out and the expense actually incurred. If that all sounds

1

routine, that's because it should.  In fact, Morning Star has used this method since its founding.  And the IRS had endorsed this practice—it audited Morning Star in the early 1990s and concluded that this practice was acceptable.  But now, after allowing Morning Star's deductions for years, the IRS changes its mind and demands that Morning Star alter how it recognizes the reconditioning costs.

Taxpayers who, like Morning Star, use the accrual method of accounting are allowed to "deduct expenses in the year which they are incurred, regardless of when paid."  *Gold Coast Hotel & Casino v. United States*, 158 F.3d 484, 487 (9th Cir. 1998).  To determine whether expenses are incurred, we apply the "all events" test. *See* 26 U.S.C. § 461(h)(4).  This test operates on the principle that "although expenses may be deductible before they become due and payable, liability must first be firmly established."  *United States v. General Dynamics Corp.*, 481 U.S. 239, 243 (1987).  And it is satisfied "with respect to any item if all events have occurred which determine the fact of liability and the amount of such liability can be determined with reasonable accuracy."  26 U.S.C. § 461(h)(4).  We are only concerned with the "fact of liability" prong here.

The "fact of liability" requirement is satisfied when the liability is "fixed, absolute, and unconditional."  *Gold Coast*, 158 F.3d at 487 (simplified).  So this case turns on whether Morning Star's reconditioning expenses were fixed, absolute, and

2

unconditional when each year's production run ended. They were. And two cases are instructive here.

First, there's *United States v. Hughes Properties, Inc.*, 476 U.S. 593 (1986). In that case, the Supreme Court determined that a casino operator could deduct money guaranteed for payment on a progressive slot machine even though it hadn't been won by a gambler at the end of the year. *Hughes*, 476 U.S. at 595–96, 601–02. As the Court explained, "the last play of the machine before the end of the fiscal year" created the liability because "that play fixed the jackpot amount irrevocably" under Nevada law, which prevented the casino from reducing the "payoff without paying the jackpot." *Id.* at 601–03. And because the liability was fixed, hypothetical situations like the casino going out of business, entering bankruptcy, or having customers stop gambling were irrelevant. *Id.* at 601. Such risk "exists for every business that uses an accrual method, and it does not prevent accrual" because "[t]he existence of an absolute liability is necessary; absolute certainty that it will be discharged by payment is not." *Id.* at 606 (simplified).

Second, there's *Gold Coast Hotel*. There, we concluded that a casino could deduct the value of redeemable points for the year in which a casino member accumulated the minimum amount needed to redeem a prize, regardless of when the points were used. *See* 158 F.3d at 485–89. We explained that the "liability to redeem accumulated slot points is fixed and unconditional under state law once a slot club

members accumulates 1,200 points" and that "the fact a club member may choose not to redeem his/her points immediately does not render Gold Coast's otherwise fixed liability conditional." *Id.* at 488.

These cases stand for a straightforward principle—when liability is legally certain, the taxpayer may deduct it from their income in the tax year in which the liability became fixed. And the law doesn't require the taxpayer to prove the fixed obligation to a metaphysical certitude.

Morning Star's liability was fixed at the end of each season's production run. First, a series of loan agreements requires Morning Star to maintain its equipment "in good condition and repair, reasonable wear and tear excepted" and prevent it from being "negligent in its care and use." Second, a set of credit agreements directs Morning Star to "keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted" and precludes it from defaulting on other contracts, including the first set of loan agreements. Third, a series of agreements with its customers mandates that Morning Star provide massive amounts of processed tomatoes over the course of several years. To comply with these legal obligations, Morning Star *must* recondition its equipment at the end of the tomato processing season.

Without restoring, rebuilding, and sterilizing the equipment after the season, Morning Star wouldn't be able to use the equipment again. Failing to recondition

4

the equipment would thus make Morning Star in default of its loan, credit, and customer agreements. Non-useable equipment means it falls out of "good condition," diminishes its value, and precludes Morning Star from complying with its tomato processing obligations. For example, I imagine that Morning Star's lenders would balk at loaning the company significant sums of money (well over $100 million) and then having Morning Star inflict $20 million of damage to its collateral without a duty to repair. So the last production run is a direct analogue to the "last play" in *Hughes* or accumulation of 1,200 points in *Gold Coast*.

The majority errs by concluding that the reconditioning was "ordinary wear and tear." Whatever "ordinary wear and tear" means, it cannot mean damaging the equipment to the sum of $21 million in repairs. "Ordinary wear and tear" is when your bathroom's tiles fade, a tire tread gets worn down, or when a door handle becomes loose. It is not catastrophic damage that requires millions to repair. Claiming that a recurring, $21 million expense is "ordinary wear and tear" doesn't pass the straight-face test.

I respectfully dissent.